Andrew A. MYERS, et al., Plaintiffs,

v.

Leroy D. BACA, et al., Defendants.

No. CV 02–08098 SVW(RZx).

United States District Court,
C.D. California.

July 15, 2004.

Elizabeth J. Gibbons, Green & Shinee, Encino, CA, for Plaintiffs.

Calvin R. House, Christine Chorba, Gutierrez, Preciado & House, Pasadena, CA, for Defendants.

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

WILSON, District Judge.

## I. INTRODUCTION

Plaintiffs are former trainees at the Los Angeles County Sheriff's Department Academy, who claim primarily that an October 2001 investigation into cheating resulted in an unconstitutional seizure of their persons, and an unconstitutional search of their briefcases. Plaintiffs brought suit against the County, Department, and various Department employees for damages and attorneys' fees. *See* 18 U.S.C. §§ 1983 and 1988. The Court has jurisdiction pursuant to 28 U.S.C. § 1331 and § 1343(a)(3).

In its Order of May 9, 2003 ("May 9 Order"), the Court granted Defendants' motion for summary judgment as to Plaintiffs' search claim, and continued the motion as to the seizure claim. The Court did conclude, however, that a Fourth Amendment seizure had occurred. Because the issue is now squarely before the Court, and in light of the developed record and additional legal argument, the Court amends and elaborates upon its earlier ruling.

For the reasons set forth herein, the Court finds that Defendants are entitled to qualified immunity as to Plaintiffs' seizure claim, and, therefore hereby GRANTS Defendants' Motion for Summary Judgment.

## II. Factual Background

Although minor disputes have appeared in the moving papers and hearings over the precise timing of certain events, the parties are in substantial agreement as to most material facts. (*See* Defendants' Reply to Plaintiffs' Sep. Statement of Uncontroverted Facts.) Where material facts are disputed, the Court views such facts in the light most favorable to the nonmoving parties, as it is required to do at this stage of the case. *See Wall v. County of Orange*, 364 F.3d 1107, 1110 (9th Cir.2004). Accordingly, the facts presented in the light most favorable to Plaintiffs, along with the inferences rationally flowing from them, are as follows:

In fall 2001, Plaintiffs were employed as Los Angeles County Deputy Sheriff Trainees at the Department's Academy. At approximately 9:00 a.m. on Friday, October 19, 2001, Trainee Stacie Dobine informed one of her instructors, Defendant Deputy William J. Bartlett, that some

members her class (Class 325) possessed and/or were selling test questions for an exam. Bartlett questioned Dobine about the identity of the alleged wrongdoers, but was told only that they were members of the same study group. (Plaintiffs suggest Dobine knew the actual identities, but in any case she did not disclose them.)

Around 9:15 a.m., the members of Class 325, including Plaintiffs, were ordered to open and unlock their briefcases, leave their classroom, and assemble outdoors in platoon formation. For the next hour, the members of Class 325 remained outside while a search of their classroom and briefcases was conducted by certain Defendant officials.[1]

Class 325 remained outdoors for about an hour, whereupon they were escorted by Academy instructors to classroom K–1, a room they did not regularly use. Upon arrival in room K–1, the trainees were instructed to sit in every other seat, to face forward, not to speak to anyone, and not to leave, read, write, use the phone, or go to the restroom without an escort. The record does not suggest that any instructors remained in the room, but the trainees were informed that they were being videotaped and monitored. (The room was known to Plaintiffs Santa Maria and Ramos to include a one-way mirror where staff instructors could monitor the room's occupants without being observed.) Plaintiffs attest that all of the instructions were given in a loud or gruff manner, a characterization Defendants do not dispute.

At this point, the trainees had not been told why their briefcases had been searched, why they had been ordered outside, or why they were now being sequestered in room K–1. Class 325 remained under these conditions until approximately 2:00 p.m. At that time, the trainees were permitted to retrieve their lunches from their usual room, and were afforded ten minutes in room K–1 to eat.

Following lunch, the class members were ordered to return to their regular classroom (room B–1). At this point, the trainees were informed by Defendant instructor Gregory S. Adams that there was an ongoing investigation into "misconduct." The class also was specifically told at this time that they were not free to leave until they had been interviewed by officials of the Internal Affairs Bureau[2] ("IAB"), whom Adams indicated to be in route to the Academy. Plaintiffs attest that these comments were made in a "degrading, threatening, and belittling manner," and that the class members were compared to a disgraced former Los Angeles police officer who had recently been convicted of various criminal abuses of authority. Plaintiffs also attest that they felt if they tried to leave the classroom, they would be physically restrained from doing so.

At this time, and at all times while Plaintiffs remained at the Academy on October 19, Plaintiffs were permitted to retain their departmentally-issued weapons. However, because Plaintiffs were not sworn peace officers, they were not au-

---

1. The Court's May 9 Order granted summary judgment for Defendants as to Plaintiffs' claim that this search was unconstitutional. Accordingly, the facts specific to the search claim are not restated here in full, but are incorporated herein by reference.

2. According to official policy of the Los Angeles County Sheriff's Department, the responsibilities of the IAB are as follows: "The

Internal Affairs Bureau is responsible for conducting administrative investigations of policy violations and allegations of misconduct made against both civilian and sworn Department employees. The Bureau is also responsible for reviewing incidents of significant force and deputy involved shootings." (2–04/030.00 Internal Affairs Bureau, Exh. A to Decl. of Dennis Burns).

thorized to carry loaded firearms. As such, Plaintiffs carried their weapons in their holsters but with no ammunition in the weapons and with orange tape over both the barrel and the magazine of the weapons.

Between 2:00 and 3:30 p.m., the class was given a regularly scheduled lecture. Following the lecture, at about 3:30 p.m., Defendant Adams again informed the trainees that they were not free to leave, talk, or interact with their classmates until they were interviewed by IAB officials. Again, Plaintiffs attest that they did not feel free to leave and that if they did attempt to leave, they would be physically restrained from doing so.

At approximately 6:00 p.m., the trainees were addressed by Defendant Dennis Burns, the head of the IAB. Burns informed Plaintiffs and their classmates that there was an investigation of "misconduct" underway, but did not specify the allegations. Burns then read off the names of nine trainees, including Plaintiffs, and specifically stated that these nine were not free to leave until they were interviewed by IAB. The other trainees were permitted to leave.

Plaintiffs remained at the Academy until approximately 1:00 a.m. During the remainder of their time in room B–1, Plaintiffs were not permitted to eat (despite a request to do so), and could only use the restroom with an escort. They were allowed to meet with an attorney from their union (the Association for Los Angeles Deputy Sheriffs ("ALADS")), and were provided one opportunity to call their families regarding their whereabouts or to make childcare arrangements (if necessary). Plaintiffs attest that during this time they continued to feel that if they attempted to leave the Academy facility they would be physically restrained and prevented from doing so.

Although Plaintiffs Myers and Santa Maria were never personally interviewed by any IAB official on October 19, 2001, they did observe certain other trainees being told to report to the staff office for interviews prior to the arrival of the ALADS representatives and attorneys. It appears to be disputed whether and/or when Plaintiff Ramos was ever interviewed, though he states that he was interviewed, and that the interview took place before the ALADS attorneys arrived.

Shortly after midnight, Plaintiffs were escorted to the locker room, where they were instructed to turn in their weapons, batons, and other equipment. At that time, Plaintiffs were told that they could either resign or be fired the following Monday. By Sunday, this decision had apparently been reversed, and Plaintiffs were informed by phone that they could return to the Academy "as if nothing had happened." When they subsequently returned to the Academy, Plaintiffs filed for and were paid overtime for the events at issue.

Defendants' explanation as to why this investigation was so lengthy, while materially undisputed, is a case study in bureaucratic inefficiency. For instance, although a search was completed by Academy instructors within thirty-five minutes of the initial cheating allegation, Department officials believed it was necessary to involve the entire chain of command before proceeding further. As a result, there was a nearly two hour delay while the Sheriff, Undersheriff and other executives attended a graduation ceremony. It would be another two hours before the Internal Affairs Bureau would be contacted, and a large team of investigators assembled, briefed and deployed to the Academy.

Substantial delay is also attributable to the intervention of the trainees' union, which apparently came about by way of a

call from a Sheriff's Deputy who had learned of the investigation. The union representatives who responded to the Academy were not authorized to represent the cadets during the interviews. They therefore demanded an end to interviewing, which demand was eventually acceded to. This precipitated another two-hour delay, while union attorneys in route to the Academy wound their way through Friday afternoon traffic.

Upon arrival, and prior to a resumption of the interviews, the attorneys spent two to three hours meeting with their clients and Academy officials. The interviews then proceeded for at least a couple hours, followed by further debate among the investigators as to what to do with the information that had been gleaned. Finally, at about 1 a.m., approximately eight to nine hours after the training for the day would have ended, the trainees were released.

### III. Legal Standard

#### A. *Summary Judgment*

Rule 56(c) requires summary judgment for the moving party when the evidence, viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Tarin v. County of Los Angeles,* 123 F.3d 1259, 1263 (9th Cir.1997). The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

That burden may be met by " 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. at 2554. Once the moving party has met its initial burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and identify specific facts that show a genuine issue for trial. *See id.* at 324, 106 S.Ct. at 2553; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Furthermore, only genuine disputes—where the evidence is such that a reasonable jury could return a verdict for the nonmoving party—"over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248, 106 S.Ct. 2505; *see also Arpin v. Santa Clara Valley Transp. Agency,* 261 F.3d 912, 919 (9th Cir.2001) (the nonmoving party must offer specific evidence from which a reasonable jury could return a verdict in its favor).

#### B. *Qualified Immunity*

 In a suit against an officer for an alleged violation of a constitutional right, the Court must consider whether the officer is entitled to qualified immunity. *Saucier v. Katz,* 533 U.S. 194, 200, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). "Qualified immunity is an entitlement not to stand trial or face the other burdens of litigation." *Id.* (quoting *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)). The notion of qualified immunity is grounded in the policy considerations that the "public interest requires decisions and action to enforce laws for the protection of the public." *Scheuer v. Rhodes,* 416 U.S. 232, 241, 94 S.Ct. 1683, 1689, 40 L.Ed.2d 90 (1974); *see also Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 2729, 73 L.Ed.2d 396 (1982). Underlying the doctrine of qualified immunity is the recognition that "officials can act without fear of harassing litigation only if they reasonably can anticipate when their conduct may give rise to liability for damages and only if unjustified lawsuits are quickly

terminated." *Davis v. Scherer,* 468 U.S. 183, 195, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984). As such, qualified immunity provides "ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant,* 502 U.S. 224, 229, 112 S.Ct. 534, 537, 116 L.Ed.2d 589 (1991) (citation and internal quotation omitted).

■ Qualified immunity is appropriate if the facts, taken in the light most favorable to the party asserting injury, do not show that the officer's conduct violated a clearly established constitutional right. *Id.* at 201, 104 S.Ct. 3012; *see Harlow,* 457 U.S. at 818, 102 S.Ct. 2727; *Wall,* 364 F.3d at 1110; *Jeffers v. Gomez,* 267 F.3d 895, 909 (9th Cir.2001). This requires a two-part analysis, in which the court determines 1) whether the facts alleged show that the officer's conduct violated a constitutional right; and 2) whether the right in question was "clearly established." *Martinez v. Stanford,* 323 F.3d 1178, 1183 (9th Cir. 2003) (quoting *Saucier,* 533 U.S. at 201–02, 121 S.Ct. 2151).

## IV. Discussion

### A. *Violation of Plaintiffs' Fourth Amendment Rights*

#### 1. *Seizure*

##### a. *Legal Principles*

■ The Fourth Amendment protects citizens against "unreasonable searches and seizures." U.S. Const. amend. IV. An individual need not be subject to a criminal investigation in order for Fourth Amendment protections to attach. *See Cerrone v. Brown,* 246 F.3d 194, 200 (2d Cir.2001) (acknowledging that police officers may be seized in violation of the Fourth Amendment "in connection with internal administrative or disciplinary proceedings"); *United States v. Taketa,* 923 F.2d 665, 673–74 (9th Cir.1991) (search of state

agent's office in furtherance of internal investigation governed by Fourth Amendment); *Biehunik v. Felicetta,* 441 F.2d 228, 229–231 (2d Cir.1971), *cert. denied,* 403 U.S. 932, 91 S.Ct. 2256, 29 L.Ed.2d 711 (1971) (analyzing "seizure" of police officers for lineup in internal investigation of "brutal or unlawful" conduct). Indeed, the Fourth Amendment is "applicable to the activities of civil as well as criminal authorities." *New Jersey v. T.L.O.,* 469 U.S. 325, 335, 105 S.Ct. 733, 739, 83 L.Ed.2d 720 (1985). *Accord O'Connor v. Ortega,* 480 U.S. 709, 715, 107 S.Ct. 1492, 1496, 94 L.Ed.2d 714 (1987). The Supreme Court has held that the Fourth Amendment's prohibition on unreasonable searches and seizures applies to public school officials, *see T.L.O.,* 469 U.S. at 335, 105 S.Ct. 733, building inspectors, *see Camara v. Municipal Court,* 387 U.S. 523, 528, 87 S.Ct. 1727, 1730, 18 L.Ed.2d 930 (1967), Occupational Safety and Health Act inspectors, *see Marshall v. Barlow's Inc.,* 436 U.S. 307, 312–13, 98 S.Ct. 1816, 1820, 56 L.Ed.2d 305 (1978), and firemen entering privately owned premises to battle a fire, *see Michigan v. Tyler,* 436 U.S. 499, 506, 98 S.Ct. 1942, 1948, 56 L.Ed.2d 486 (1978).

■ However, while the Fourth Amendment has been held to apply to governmental conduct outside the realm of law enforcement, "the types of non-law enforcement conduct to which the [Supreme] Court has extended the scope of the amendment are... typically motivated by some sort of investigatory or administrative purpose designed to elicit a benefit for the government." *U.S. v. Attson,* 900 F.2d 1427, 1430 (9th Cir.1990), *cert. denied* 498 U.S. 961, 111 S.Ct. 393, 112 L.Ed.2d 403 (1990). Therefore, in order for non-law enforcement governmental conduct to be considered a search or seizure under the Fourth Amendment, such conduct must have "as its purpose the intention to elicit a benefit for the government in ei-

ther its investigative or administrative capacities." *Id.* at 1431.[3]

■■■ "A seizure of the person within the meaning of the Fourth and Fourteenth Amendments occurs when, taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." *Kaupp v. Texas*, 538 U.S. 626, 123 S.Ct. 1843, 1844, 155 L.Ed.2d 814 (2003) (internal quotations omitted). Thus, an encounter between an officer or other government official and an individual "will not trigger Fourth Amendment scrutiny unless it loses its consensual nature." *Florida v. Bostick*, 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991).

■■■ A seizure of the person includes not only a full-fledged arrest, but also "investigatory detentions," *see Davis v. Mississippi*, 394 U.S. 721, 726, 89 S.Ct. 1394, 1397, 22 L.Ed.2d 676 (1969), and any other "detention of [a person] against his will," *see Cupp v. Murphy*, 412 U.S. 291, 294, 93 S.Ct. 2000, 2003, 36 L.Ed.2d 900 (1973). *See also Doe ex rel. Doe v. Hawaii Dept. of Educ.*, 334 F.3d 906, 909 (9th Cir.2003)

("[The] Fourth Amendment right to be free from an unreasonable seizure 'extends to seizures by or at the direction of school officials.'") (quoting *Hassan v. Lubbock Ind. School Dist.*, 55 F.3d 1075, 1079 (5th Cir.1995)); *Ganwich v. Knapp*, 319 F.3d 1115, 1120 n. 7 (9th Cir.2003) (acknowledging that plaintiffs were seized within meaning of Fourth Amendment while assuming that plaintiffs' detention did not mature into a full-fledged arrest); *Pino v. Higgs*, 75 F.3d 1461, 1467 (10th Cir.1996) ("The Fourth Amendment is not limited to criminal cases, but applies whenever the government takes a person into custody against her will.") (citing *In re Barnard*, 455 F.2d 1370, 1373–74 (D.C.Cir.1971)); *Wallace v. Batavia School Dist. 101*, 68 F.3d 1010 (7th Cir.1995) (where teacher momentarily grabbed student's wrist and elbow to escort student out of classroom in order to prevent a fight, a seizure under the Fourth Amendment took place but such seizure was reasonable under the circumstances).

■■■ Though an individual need not be arrested in order for a seizure of the person to have occurred, the restraint on liberty typically must be effected by physical force or a show of lawful authority.[4]

---

3. Notably, searches of students by public school officials retain their investigatory and administrative nature even if they are conducted only to yield evidence of violations of school rules. *See T.L.O.*, 469 U.S. at 335, 105 S.Ct. 733.

4. While the seizure of a person is a necessary condition of an arrest, the Court emphasizes that the question of whether a seizure of the person has taken place is distinct from the question of whether a person has been arrested. Indeed, an arrest is only one type of Fourth Amendment seizure, the threshold for which is higher than a mere investigatory detention. *See Terry*, 392 U.S. 1, 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) ("It is quite plain that the Fourth Amendment governs 'seizures' of the person which do not eventuate in a trip to the station house and prosecution for crime—'arrests' in traditional termi-

nology. It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person."). Arrests must be predicated on probable cause, while investigatory detentions may, depending on the circumstance, be based on a reasonableness standard. *See infra* at 1107–08. Thus, the body of caselaw discussing whether a person has been arrested for purposes of determining whether the probable cause requirement attaches, *see e.g., Craig v. Singletary*, 127 F.3d 1030, 1042 (11th Cir.1997), is relevant to the instant case only insofar as such cases shed light on whether a Fourth Amendment seizure has occurred. That is, anyone who has been arrested has necessarily been seized, so, therefore, if a court concludes that a person has been arrested, the factors that led a court to such a conclusion would be relevant to this

*See California v. Hodari D.*, 499 U.S. 621, 626–27, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991); *Terry v. Ohio*, 392 U.S. 1, 19, 88 S.Ct. 1868, 1879 n. 16, 20 L.Ed.2d 889 (1968) ("Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred"). While it is well-established that "searches and seizures by government employers or supervisors of the private property of their employees ... are subject to the restraints of the Fourth Amendment," *O'Connor v. Ortega*, 480 U.S. 709, 715, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987), it is reasonably clear that "the possibility or even probability of adverse employment action—as opposed to physical detention—cannot enter [the] analysis" as to whether employees in a particular case have been "seized." *Driebel v. City of Milwaukee*, 298 F.3d 622, 642 (7th Cir. 2002).

Furthermore, an individual's voluntary choices may give rise to a limitation on freedom that does not equate to a seizure by law enforcement. For instance, a passenger on a bus that is preparing to depart freely limits his movement, and cannot be said to have been "seized" merely because law enforcement approaches him. *Bostick*, 501 U.S. at 436, 111 S.Ct. 2382. His movements may be " 'confined' in a sense, but this is the natural result of his decision to take the bus; it says nothing about whether or not the police conduct at issue was coercive." *Id.*

The same is true of the work environment. "Ordinarily, when people are at work their freedom to move about has been meaningfully restricted, not by the actions of law enforcement officials, but by the workers' voluntary obligations to their employers." *INS v. Delgado*, 466 U.S. 210, 218, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984). This restriction of action in the

work environment is even more true in the military or paramilitary context. The United States Court of Military Appeals described the application of the Fourth Amendment to military personnel in this manner:

> The question whether a person has been seized within the meaning of the Fourth Amendment is said to turn on whether, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave police custody. Of course in the military, servicemembers rarely enjoy total freedom of movement. Rather, their place of duty and comings and goings are routinely determined by superiors, with the full backing of criminal sanctions. By donning the uniform, the servicemember knowingly accepts restrictions on liberty and privacy—in the name of military necessity, effectiveness, and discipline—that his civilian counterpart would never tolerate. Thus to incorporate civilian standards of freedom of movement wholesale into the military setting would be unrealistic.

*United States v. Fagan*, 28 M.J. 64, 69 (C.M.A.1989) (internal quotations and citations omitted). At the same time, however, plaintiffs are not military personnel, but are in training to become law enforcement officials. The Supreme Court has made it clear that "policemen... are not relegated to a watered-down version of constitutional rights." *Garrity v. New Jersey*, 385 U.S. 493, 500, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967).

b. *Plaintiffs Were Seized Within Meaning of Fourth Amendment*

 The conduct at issue here was, initially, consistent with the supervisory treatment of police officer trainees. Plaintiffs and their classmates were made to

Court's determination as to whether Plaintiffs were seized.

stand in formation, and later to spend part of their scheduled day sitting together in a classroom. They were never physically accosted, handcuffed, jailed, deprived of their unloaded weapons or identification, charged with a specific criminal offense, individually segregated, or otherwise treated in a manner inconsistent with their status as student trainees. In short, they were not restrained in their ability to "go about their business," *Kaupp*, 123 S.Ct. at 1844, because their "business" was attendance at the Academy and obedience to the administrative instructions given them. While the supervising deputies may have lacked in grace, a gruff manner is de rigueur for paramilitary instructors. The Court concludes that a reasonable person in these circumstances would have understood that the Defendant instructors' orders were issued not as law enforcement officers, but as employee supervisors, and that any restraint on movement was attributable to their latter status.

■ However, "an initially consensual encounter ... can be transformed into a seizure or detention within the meaning of the Fourth Amendment." *Delgado*, 466 U.S. at 215, 104 S.Ct. 1758. Indeed, the circumstances of this case began to change soon after the end of the class day.

At approximately 6 p.m., one to two hours after the trainees normally would have been released for the day, they were addressed by Defendant Burns. While the rest of the class was released, Burns specifically told nine trainees, including Plaintiffs, that they were not free to leave until they were interviewed by IAB investigators, despite the fact that the "school day" had concluded.

Therefore, Plaintiffs' status differs from that of the bus passenger in *Bostick*, or the employees in *Delgado*. Plaintiffs were instructed not to leave *despite* the expiration of their work-related duty to remain at the Academy. The instruction not to leave did not come from an Academy instructor, but from the head of the Department's Internal Affairs Bureau. Plaintiffs were never specifically told that they would face only internal discipline if they decided to leave. Resolving all inferences in favor of Plaintiffs, as the Court must do at this point, the Court concludes that the information available and circumstances apparent to Plaintiffs would "have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." *Michigan v. Chesternut*, 486 U.S. 567, 569, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988). At the very least, a reasonable jury could decide that Plaintiffs submitted to the orders of an officer acting in the role of a law enforcement agent, not merely as an instructor.

Defendants argue that the Seventh Circuit's recent decision in *Driebel v. City of Milwaukee, supra*, is contrary to this conclusion. While the instant facts are similar to those in *Driebel*, they are distinguishable.[5] In *Driebel*, four police officers brought distinct claims, alleging that their Fourth Amendment rights were violated in connection with various internal investigations. 298 F.3d at 627. One of the officers, Officer Huston, had been approached while on duty by internal affairs officers and had been ordered to accompany the officers to a central office. At the central office, Huston was then made to wait in a conference room pending an interview. *Id.* at 646. Like Plaintiffs here, Huston was monitored in an isolated room, not permitted to use the restroom without an escort, and prevented from communicating

---

**5.** However, *Driebel* is more persuasive when examined in the context of Defendants' quali- fied immunity argument. *See infra* at 1114– 15.

with others. *Id.* at 648–49. Other similarities to the instant case include the facts that Huston was never deprived of his departmentally-issued weapon or identification, was compensated for his time at the central office, and was never physically restrained or charged with a specific crime. *Id.* at 648.

The facts as to Huston are distinguishable, however, in several important respects. First, it appears that the entire wait and interview transpired during Huston's *regular duty hours. See id.* at 646 (Huston was ordered to return to duty after the interview). Second, the detectives conducting the interview did not speak to Huston in a menacing manner, nor did they make coercive statements to him. Further, unlike the instant case in which Plaintiffs carried unloaded weapons and did not possess ammunition, Huston was permitted to remain in possession of his weapon, which, presumably, was (or could have been) loaded. Finally, the circuit court specifically noted that "Officer Huston was not some naive, awestruck individual confronting the police for the first time. Rather, he was a sworn, highly trained law enforcement officer, who, we believe, was well aware of his constitutional and workplace rights." *Id.* at 647; *see also id.* (emphasizing that a reasonable officer with Huston's "experience and understanding of the law and [department] policy" would not have felt compelled to report to department headquarters against his will). While Plaintiffs may not have been entirely naive or awestruck, they were neither sworn nor highly trained law enforcement officers during the events at issue, and thus cannot be charged with the same knowledge of constitutional and workplace rights. As such, a reasonable cadet in Plaintiffs' situation could plausibly have believed that he or she would have been prevented from departing the Academy by force or other show of authority. Accordingly, viewing the facts in the light most favorable to Plaintiffs, the Court finds that Plaintiffs were seized within the meaning of the Fourth Amendment.

### 2. *Reasonableness*

Having found that a seizure did take place, the Court must next determine whether that seizure was unreasonable. *See Illinois v. McArthur,* 531 U.S. 326, 330, 121 S.Ct. 946, 148 L.Ed.2d 838 (2001) ("[The Fourth Amendment's] central requirement is one of reasonableness.").

There is little, if any, authority setting forth easily analogous factual patterns for determining whether the seizure of Plaintiffs was reasonable. Accordingly, the Court's analysis from the May 9, 2003 order of the appropriate standard under the Fourth Amendment for a non-criminal, work-related search is instructive and is incorporated herein by reference. Pursuant to that analysis, the Court stated:

> The general state of the law ... seems to be thus. First it is doubtful that the warrant requirement has any place in most legitimate, non-criminal searches of public employees. Second, the weight of the [employees'] privacy interest [being imposed upon] is balanced against the import of the governmental purpose to determine whether probable cause or the lesser "reasonableness" standard should be employed. Third, the reasonableness of the seizure, therefore, is determined by balancing the same factors, under the totality of the circumstances. *See Bd. of Educ. v. Earls,* 536 U.S. 822, 829[, 122 S.Ct. 2559, 153 L.Ed.2d 735] (2002).

(May 9, 2003 Order at 14–15).

### a. *The Reasonableness Standard Applies*

In general, a police department must have probable cause to seize its employees as part of a criminal investiga-

tion, *see, e.g. Cerrone,* 246 F.3d at 201; *Driebel,* 298 F.3d at 640. However, a lesser "reasonableness" showing is sufficient where the seizure, as here, is in connection with an internal, disciplinary investigation. *See Biehunik v. Felicetta,* 441 F.2d 228, 229–231 (2d Cir.1971), *cert. denied,* 403 U.S. 932, 91 S.Ct. 2256, 29 L.Ed.2d 711 (1971) ("seizure" of police officers for line-up in investigation of "brutal or unlawful" conduct not subject to warrant or probable cause requirements because investigation was not "directed solely toward the objective of criminal prosecution"); *Driebel,* 298 F.3d at 639–40 (implying reasonableness standard of *O'Connor v. Ortega,* 480 U.S. 709, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987), might apply where seizure is for non-criminal investigation).

■ In the May 9 Order, the Court found that for purposes of summary judgment, the investigation at issue was conducted for non-criminal purposes. (*See* May 9 Order at 9). Plaintiffs continue to assert that there is a question of material fact as to whether the investigation in this case was criminal or non-criminal. (*See* Pls.' Supp. Opp. at 8 n. 4., citing Exh. 127 at 41–44; Exh. 135 at 91–93). These citations reinforce the Court's conclusion that the investigation was an internal disciplinary investigation, but that evidence of wrongdoing could have theoretically led to a criminal investigation.[6] (*See* May 9 Order at 7–9). The Court declines Plaintiffs' requests to revisit this conclusion, and incorporates the analysis from the May 9 Order into this order. Furthermore, having analyzed the evidence offered in the light most favorable to plaintiffs, no reasonable jury could find that plaintiffs would be able to prove, by a preponderance of the evidence, that the central purpose of the investigation was criminal. Because the investigation was pursued by

---

**6.** Under *National Treasury Employees v. Von Raab,* 489 U.S. 656, 665–66, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989), whether the conduct at issue *could* be criminal is not relevant, but instead, if the central purpose of the investigation is to collect information for possible criminal prosecution, then and only then is the probable cause standard relevant. *See Cerrone,* 246 F.3d at 200. The record is devoid of any evidence supporting Plaintiffs' position that the investigation was criminal in nature. Following are summaries and excerpts from citations offered by Plaintiffs in support of the proposition that the investigation was to collect information for possible criminal prosecution:

Terry Benjestorf, an IAB sergeant, stated that if the investigation was criminal in nature, it would have been performed by a different division, in which he did not work. His acknowledgment that possessing, purchasing, or selling stolen property that is known or reasonably known to be stolen is a crime merely states the obvious. (Benjestorf Depo. pp. 89–93.)

Lieutenant Levario's statements are even more damaging to plaintiffs' contention:

Q: Was there an allegation that the misappropriation of the post examination was a criminal act?

A: I don't think we had gotten to that...

Q: So would it be a criminal act for somebody to somehow break into a secured location to obtain [the test] material?

A: Well, I don't know if it constitutes necessarily a criminal act. I looked at it or I would look at it as breaking into a locked location to obtain materials that aren't yours... Some people might look at that as stealing.

\* ❖ \* ❖ \* ❖

Q: Was there any discussion about the allegation of alleged criminal misconduct?

A: Not to my knowledge. I don't recall anybody discussing that it was criminal misconduct.

(Levario Depo. pp. 42–44.)

Plaintiffs also cite to the deposition testimony of Lieutenant Adams. His testimony does not support their argument either. Adams briefed Sheriff Baca, using the words "possibly stolen," and Baca then ordered an IAB investigation, not a criminal investigation. Adams denied that he was aware of allegations that the test materials had been bought or sold. (Adams Depo. pp. 62–67.)

supervisors and those charged with investigations of internal misconduct, and because a criminal investigation was never initiated, (*see id.*), Defendants' actions are not subject to the probable cause standard of the Fourth Amendment. *See United States v. Taketa,* 923 F.2d 665, 674–76 (9th Cir.1991). Rather, the lesser "reasonableness" standard applies.

b. *"Reasonableness" Under Totality of Circumstances*

■ Using a standard of "reasonableness," the Court must determine, in light of the competing interests involved, whether the length and conditions of the seizure were unreasonable and, therefore, constitute a violation of Plaintiffs' Fourth Amendment rights. In making this determination, the Court asks whether the seizure was 1) justified at its inception, and 2) reasonably related in scope to the circumstances that justified it. *Gonzalez,* 300 F.3d at 1054. *See also O'Connor,* 480 U.S. at 726, 107 S.Ct. 1492 (To conform to the Constitution, the seizure "as actually conducted [must be] reasonably related in scope to the circumstances which justified the interference in the first place.") (quotations omitted).

Specifically, the Court must determine whether it was reasonable to detain the nine trainees after approximately 6 p.m.— the point at which the seizure, as such, began. If, after a balancing of interests, detaining the trainees after 6 p.m. was initially reasonable, then the next step in the analysis is to determine whether the scope of the seizure and its protracted length were reasonable given the circumstances that arguably justified the detention in the first place.

It is without question that the Department has a significant interest in investigating misconduct by prospective law enforcement officials with the aim of achieving a moral, ethical, and law-abiding body of peace officers. Nevertheless, the question remains, how strong was the Department's interest in detaining the trainees at that particular time—after the school day had ended? Defendants seem to argue that the Department could not conduct the interviews at another time for fear that the trainees would coordinate their stories. Notably, there was no risk that the trainees would abscond or become unavailable, nor was there any suggestion that evidence could have been destroyed.

As for Plaintiffs, not only were they detained, but they were also told at the outset that they were not free to leave until they had been interrogated. This threat to their privacy interests is informed by *Ganwich v. Knapp,* 319 F.3d 1115 (9th Cir.2003). While *Ganwich* is distinguishable upon several grounds, most importantly because the seizure arose in a criminal context and it was clear that the officers performing the seizure were doing so in their capacities as law enforcement officials, *Ganwich* is still instructive in that it indicates that detaining someone in order to coerce him into submitting to an interrogation is particularly intrusive.

In *Ganwich,* the court was faced with the question of "whether law enforcement officers violated employees' Fourth Amendment rights by detaining them incommunicado without probable cause and using the threat of continued detention to coerce them to submit to interrogations." 319 F.3d at 1117. The plaintiffs, employees of a business suspected of criminal wrongdoing, were detained during a search of the business' premises by officers executing a search warrant despite the fact that none of them had any knowledge of their employer's allegedly fraudulent business practices. Upon serving the search warrant at the business' offices, the officers gathered the plaintiffs in a waiting

room and told the plaintiffs that they were not under arrest, but that they would be held in the waiting room until they submitted to individual interviews with police investigators in a back room. During their detention, the plaintiffs were not permitted to leave the waiting room, go to the restroom unattended, retrieve personal possessions, make telephone calls, or answer the telephone when it rang. The plaintiffs were detained in this manner for up to four hours and forty-five minutes, gaining release only after submitting to tape-recorded interrogations.

In affirming the district court's denial of the defendants' summary judgment motions, the Ninth Circuit found that the seizure was not reasonable under the Fourth Amendment.[7] Because the seizure did not involve conduct that was per se unreasonable, such as making an arrest without probable cause, the "appeal fit[ ] within the category of cases in which it is appropriate to balance governmental and individual interests." *Id.* at 1119–20. Specifically, the court "balance[d] the privacy-related and law enforcement-related concerns to determine if the intrusion was reasonable." *Id.* at 1120 (quoting *McArthur,* 531 U.S. at 331, 121 S.Ct. 946).

Ultimately, the court concluded that it was reasonable to detain the plaintiffs on their employer's premises during the search of the building, but "it was not at all reasonable to condition the plaintiffs' release on their submission to interrogation." *Id.* In finding the detention to be reasonable, the court emphasized the important law enforcement interests it served. Holding the employees in the waiting. room prevented the employees from fleeing, minimized the risk of harm to the officers, and ensured the employees were on the premises to provide the officers with necessary assistance. *Id.* These interests outweighed the plaintiffs' privacy-related concerns implicated by their detention, which the court found "worked no great invasion of privacy." *Id.*

The court then balanced the governmental interests furthered and the individual interests impinged upon by the officers' conditioning of each employee's release on submission to individual interrogation. The interrogations served a proper, perhaps even important, government interest of "gathering information about allegedly criminal activities." *Id.* at 1121. However, this interest was "no so important so as to outweigh the plaintiffs' privacy rights, which the coerced interrogations severely invaded." *Id.* Finding that the officers' conduct "closely resembled the custodial interrogation that might take place at a police station," the court held:

> [T]his sort of coerced interrogation is a serious intrusion upon the sanctity of the person. It may inflict great indignity and arouse strong resentment. It may make the subject feel the target of the government's vast machinery, in grave legal peril, alone and without counsel. It may make the subject feel that dread consequences hang on his or her words. It may make the subject feel that silence is not an option.

*Id.* Thus, these privacy-related interests, which are protected by the Fourth Amendment, outweighed the government's "legitimate interest in seeking voluntary cooperation from all," and the compelled

---

7. In *Ganwich,* the Ninth Circuit was reviewing the district court's denial of summary judgment motions in which the defendant officers argued that they were entitled to qualified immunity. The *Ganwich* court applied the two-pronged test of *Saucier* in holding that 1) the officers' conduct violated the plain-tiffs' Fourth Amendment rights and 2) such violation was in contravention of clearly established law. The Court's citations to *Ganwich* are exclusively from the portion of the opinion analyzing whether the plaintiffs' Fourth Amendment rights had been violated.

interrogations were found to be impermissible.[8] *Id.*

The *Ganwich* court offered further support for its position by looking to another "rule" of Fourth Amendment law: "A seizure becomes unlawful when it is 'more intrusive than necessary.' The scope of a detention 'must be carefully tailored to its underlying justification.'" *Id.* at 1122 (quoting *Florida v. Royer,* 460 U.S. at 504, 500, 103 S.Ct. 1319). Because "[t]he interrogations did not deter the plaintiffs' flight, did not reduce the risk of harm to officers, and did not assist the officers in the orderly completion of the search," the interrogations "were not carefully tailored to the detention's underlying justification." *Id.* Thus, the officers' conduct was more intrusive than necessary and, therefore, was unlawful. *Id.*

Ultimately then, *Ganwich* indicates that, in the context of a criminal investigation, holding a person incommunicado and using that person's continued detention to coerce him into submitting to an interrogation is particularly intrusive.

 With *Ganwich* in the background, the Court now returns to the task at hand—balancing the nature of the intrusion on Plaintiffs against the governmental interest in seizing Plaintiffs. As noted, the Department's interest was in preventing the trainees from coordinating their stories. It is Defendants' burden to show that there was a legitimate interest in the seizure. "[I]n justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio,* 392 U.S. at 21, 88 S.Ct. 1868; *Royer,* 460 U.S. at 500, 103 S.Ct. 1319 (stating that "[i]t is the State's burden to demonstrate that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure.").

In attempting to prevent coordination of the students' stories, Defendants detained Plaintiffs essentially incommunicado, under threat of interrogation. Furthermore, these detentions were for a significant period of time. In the Court's view, Defendants have failed to proffer a satisfactory, reasoned explanation as to the potential harm if interviews were to be suspended and then resumed on the next regularly scheduled work day. Defendants' conclusory statement that sequestration of the trainees was necessary to avoid collaboration of the trainees' stories is, on balance, insufficient to justify their detention because the seizure was more intrusive than necessary and not carefully tailored to the underlying justifications for the seizure. *See Ganwich,* 319 F.3d at 1121; *Royer,* 460 U.S. at 500, 504, 103 S.Ct. 1319.

The Court thus finds that the governmental interests asserted here do not outweigh the intrusion upon Plaintiffs' privacy and, therefore, that the seizure of Plaintiffs was not justified at its inception, roughly 6 p.m., and even less so as the night grew longer. To the extent that this Court's May 9 Order is inconsistent with

---

**8.** The court noted that even if individualized suspicion as to the plaintiffs existed, "it would not have justified the officers' coercing the plaintiffs into back-room interrogations." *Id.* at 1122 n. 12. In reaching this conclusion, the court relied upon *Florida v. Royer,* 460 U.S. at 502, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983), which held that moving a *criminal* suspect from an airport concourse to a nearby police room for questioning was a "more serious intrusion ... on personal liberty than is allowable on the mere suspicion of *criminal* activity." (emphases added). The question arises whether such reasoning is applicable when the state actor possesses individualized suspicion of a person for a non-criminal activity and, accordingly, detains and/or interrogates that person.

the current determination that the seizure began at roughly 6 p.m. and that the seizure was unlawful at its inception, the May 9 Order is vacated in part. Because the seizure was not reasonable under the totality of the circumstances, viewing the facts in the light most favorable to the non-moving party, it is the Court's determination for the purposes of Defendants' motion for summary judgment that Plaintiffs' Fourth Amendment rights were violated.

## B. *Clearly Established Nature of the Right*

### 1. *Legal Principles*

Because the Court has determined that Defendants violated Plaintiffs' Fourth Amendment rights, the Court must turn to the second step of the two-part analysis set forth by the Supreme Court in *Saucier*: whether the law regarding the constitutional right violated by Defendants was clearly established at the time of the constitutional violation. *Saucier*, 533 U.S. at 200, 121 S.Ct. 2151. *See also Serrano v. Francis*, 345 F.3d 1071, 1077 (9th Cir. 2003). Several cases have indicated that the Court's analysis in determining whether a constitutional violation has occurred is relevant to determining whether the right was clearly established—that is, if the Court's analysis reveals the question of whether a constitutional right has been violated to have been a close one, that is a factor that weighs in favor of a finding that the right in question was not clearly established. *Mena v. City of Simi Valley*, 332 F.3d 1255, 1266 (9th Cir.2003); *Cox v. Roskelley*, 359 F.3d 1105, 1112 (9th Cir. 2004). *See also Saucier*, 533 U.S. at 201, 121 S.Ct. 2151.

 This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151. Indeed, " 'the right the official is alleged to have violated must have been "clearly es-

tablished" in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.' " *Id.* at 202, 121 S.Ct. 2151 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). In other words, "[t]he relevant, dispositive inquiry is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202, 121 S.Ct. 2151. If a reasonable officer "could have reasonably but erroneously believed that his or her conduct did not violate [Plaintiffs'] rights," then qualified immunity must be granted. *Devereaux v. Abbey*, 263 F.3d 1070, 1074 (9th Cir.2001) (en banc).

 The officer's conduct is measured according to the state of the law as of the date of events giving rise to the lawsuit—that is, "officials are charged with knowledge of constitutional developments at the time of the alleged constitutional violation." *Lum v. Jensen*, 876 F.2d 1385, 1387 (9th Cir.1989), *cert. denied*, 493 U.S. 1057, 110 S.Ct. 867, 107 L.Ed.2d 951 (1990). In determining whether the law was clearly established at such time, a court "need not look to a case with identical or even 'materially similar' facts." *Serrano*, 345 F.3d at 1077 (quoting *Hope v. Pelzer*, 536 U.S. 730, 739–41, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002)). "[S]tate officials are not entitled to qualified immunity simply because no case with materially similar facts has held their conduct unconstitutional. The standard is one of fair warning: where the contours of the right have been defined with sufficient specificity that a state official had fair warning that her conduct deprived a victim of his rights, she is not entitled to qualified immunity." *Haugen v. Brosseau*, 339 F.3d 857, 873 (9th Cir.2003) (citations omitted). *See Hope*, 536 U.S. at 741, 122 S.Ct. 2508

("[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances."); *Anderson,* 483 U.S. at 640, 107 S.Ct. 3034 ("This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in light of pre-existing law the unlawfulness must be apparent."); *Cox,* 359 F.3d at 1112; *Graves v. City of Coeur D'Alene,* 339 F.3d 828, 846 (9th Cir.2003); *Mena,* 332 F.3d at 1261; *Flores v. Morgan Hill Unified School District,* 324 F.3d 1130, 1136–37 (9th Cir.2003); *Headwaters Forest Defense v. County of Humboldt,* 276 F.3d 1125, 1131 (9th Cir.2002).

▮▮▮▮ "A right can be clearly established even though there was no binding precedent in this circuit" at the time of the alleged violation. *Lum,* 876 F.2d at 1387. Where there is no binding precedent, courts in the Ninth Circuit "look to all available decisional law, including the law of other circuits and district courts, to determine whether the right was clearly established." *Id. Accord Osolinski v. Kane,* 92 F.3d 934, 936 (9th Cir.1996); *Figueroa v. United States,* 7 F.3d 1405, 1409 (9th Cir.1993); *Capoeman v. Reed,* 754 F.2d 1512 (9th Cir.1985). If there is no on-point Ninth Circuit authority and are few other cases on point, then a court may "evaluate the likelihood that this circuit or the Supreme Court would have reached the same result as courts that had already considered the issue." *Lum,* 876 F.2d at 1387. *Accord Osolinski,* 92 F.3d at 936; *Figueroa,* 7 F.3d at 1409.

2. *A Reasonable Officer Could Have Reasonably But Erroneously Believed That Plaintiffs' Fourth Amendment Rights Were Not Violated.*

As noted, at issue is Plaintiffs' contention that they were seized in violation of the Fourth Amendment in a manner that violated clearly established law. The Court has herein concluded that, viewing the facts in the light most favorable to Plaintiffs, Plaintiffs' Fourth Amendment rights were violated because Plaintiffs were (1) seized within the meaning of the Fourth Amendment and (2) that such seizure was unreasonable. Thus, in determining whether Defendants violated clearly established law, the Court first analyzes whether it would be clear to a reasonable officer that Plaintiffs were seized. If, looking to then-existing law, a reasonable officer could only have reasonably concluded that Plaintiffs were seized within the meaning of the Fourth Amendment, then the Court must determine whether it would be clear to a reasonable officer that such seizure was unreasonable.

a. *It Would Not Be Clear To A Reasonable Officer That Plaintiffs Were Seized Within The Fourth Amendment.*

▮▮▮▮ The operative question in determining whether it would be clear to a reasonable officer that Plaintiffs were seized is as follows: On October 19, 2001, could a reasonable officer, who had caused Plaintiffs to be detained in the manner set forth in this Order, reasonably but erroneously have believed that the officer's conduct would lead a reasonable person in a Plaintiff's position to believe that he would not be physically restrained or otherwise be subject to a show of lawful authority if he ignored the officer's presence and went about his business? In answering this question, it must be kept in mind that Defendants are allowed to have made a reasonable mistake as to the law applicable to the situation in which they are confronted and still retain qualified immunity. *Saucier,* 533 U.S. at 205, 121 S.Ct. 2151.

As is clear from the Court's analysis of whether Plaintiffs' Fourth Amendment rights were violated, the facts presented in this case implicate but are not readily analogous to previous cases involving the Fourth Amendment. For example, the vast majority of cases involving seizures of persons stem from criminal investigations. *See, e.g., Terry.* The few cases that discuss non-criminal internal investigations of police officers often still have significant criminal overtones. *See Biehunik.* Cases involving seizure (of property, not of persons) of high school students at school rest on special rationales that the students are minors and compelled by law to attend school. *See* W. LaFave, Search and Seizure §§ 10.11(a) & (b) (2004); *T.L.O.,* 469 U.S. 325, 105 S.Ct. 733. Cases involving searches and seizures of college students are prolific when the search and seizure takes place in a dorm room owned by the college. W. LaFave, Search and Seizure § 10.11(c) (2004). Outside of that context, the case law is essentially non-existent. Those cases relating to workplace searches, *see e.g., O'Connor,* by non-law enforcement public entities are again patently distinguishable both because the persons performing the search are not doing so having authority as peace officers nor were the persons aggrieved seized for extended periods of time. There is, in sum, no precedent directly on point, not even dicta of the Ninth Circuit, nor are there questions of law that have expressly been reserved, or even conflicting opinions of other circuits. *See Cox,* 359 F.3d at 1112–13.

 Nonetheless, it is clear that an individual's voluntary choices may give rise to a limitation on freedom that does not equate to a seizure by law enforcement. In turn, it is clearly established that when a person reasonably feels he is not free to terminate an encounter with an officer or other government official because he believes that doing so would lead to adverse employment action (as opposed to being physically prevented from leaving), that person is not seized under the Fourth Amendment. *See e.g., Delgado,* 466 U.S. at 218, 104 S.Ct. 1758. Therefore, if a reasonable officer could have reasonably believed that Plaintiffs were remaining at school to avoid adverse employment action, then that same reasonable officer would have no reason to believe that a seizure protected by the Fourth Amendment had taken place, nor that he was violating a clearly established constitutional right.

The Court finds persuasive Defendants' arguments on this point. A reasonable officer could have believed that a reasonable cadet obeyed the officers' orders and remained at the Academy after the school day had ended solely because the cadet did not want to be terminated or otherwise disciplined in an employment related manner. Among the factors that could lead a reasonable officer to such a view are: (1) Plaintiffs were not subject to physical force or restraint, nor were they explicitly threatened with physical force or restraint in the event they attempted to leave the Academy; and (2) Plaintiffs were not informed that a criminal investigation was taking place (indeed, the investigation was non-criminal, *see supra* at 1107–09) and, moreover, cheating on an exam is not a transgression that one would expect to result in a criminal investigation and prosecution; and, of course, (3) Plaintiffs were not arrested.

Furthermore, while *Driebel* was decided after the events at issue in this case took place, it nevertheless sheds light on the uncertain state of the law at that time. In *Driebel,* the Seventh Circuit expressly chose not to decide the question of "whether a police officer can state a false imprisonment claim [for improper seizure] if he happens to be denied his freedom of movement by superior officers conducting an

internal investigation." 298 F.3d at 640 n. 10. As in *Driebel,* here Plaintiffs were never told they were under arrest, and they retained their identification and department-issued weapons (albeit unloaded) throughout the evening until the very end. 298 F.3d at 646. In the words of the Seventh Circuit with respect to Huston, "[t]he fact that [Plaintiffs] [were] never physically restrained and [were] permitted to retain [their] departmentally-issued weapons, identification, and property negates the inference that [they] [were] seized," which, to the mind of the reasonable officer performing the seizure, could certainly lead to a reasonable inference that the clearly established constitutional rights of Plaintiffs were not being violated. 298 F.3d at 648.

b. *It Would Not Be Clear To A Reasonable Officer That The Seizure Of Plaintiffs Was Unreasonable Under The Fourth Amendment.*

Because it would not be clear to a reasonable officer that a seizure was taking place, that officer never would have considered the relevant balancing test. Nonetheless, the Court turns to the question of whether a reasonable officer could have reasonably but erroneously believed that if a seizure occurred, such seizure was reasonable.

Before examining whether it would be clear to a reasonable officer that the seizure of Plaintiffs was unreasonable, the Court finds that, under clearly established law, the investigation at issue was conducted for non-criminal (as opposed to criminal) purposes and, therefore, the "reasonableness" standard rather than the probable cause standard applies. Under the well-established legal principle of *Von Raab,* discussed *supra* at 1108 n. 6, whether conduct could be criminal is not relevant; rather, the probable cause standard is relevant only if the central purpose of investigation is to collect information for

possible criminal prosecution. Here, the central purpose of the investigation clearly was not for such a purpose: as explained herein, in that the investigation of the cadets was carried out by supervisors and those charged with investigations of internal misconduct. Not only was a criminal investigation was never initiated, but there is no indication whatsoever that the investigation's "central purpose" was to collect information for a possible criminal prosecution. In turn, because Plaintiffs were seized pursuant to a non-criminal, internal investigation, the reasonableness of the seizure is measured according to the "reasonableness" standard. This legal conclusion is well-supported by cases such as *Biehunik* and *Taketa,* discussed *supra* at 1106–09. Furthermore, a reasonable officer would have concluded that the central purpose of the investigation was not to collect information for a possible criminal prosecution.

Thus, the pertinent question is whether a reasonable officer could reasonably but erroneously have believed that the governmental interest in seizing Plaintiffs outweighed the nature of the intrusion on Plaintiffs' privacy. In arriving at the conclusion that the seizure of Plaintiffs was unreasonable, the Court relied most heavily on *Ganwich.* While *Ganwich* was very useful for purposes of this Court's Fourth Amendment analysis, *Ganwich* could not have informed Defendants as to the contours of Fourth Amendment law because the case was decided in 2003. However, in that the events in *Ganwich* took place in December 1999, the section of *Ganwich* addressing clearly established law speaks to the state of the law at the time of the facts giving rise to this case. *See Ganwich,* 319 F.3d at 1124–25.

Turning to *Ganwich's* discussion of clearly established law highlights the differences between *Ganwich* and this case.

During the second prong of the *Saucier* test, the *Ganwich* court focused on the principle that officers may only seize a person absent probable cause in a criminal investigation "in a handful of well-defined situations" and that this was clearly not one of those situations. *Id.* at 1124. Rather, the officers in *Ganwich* acted in violation of the principle announced in *Michigan v. Summers*, 452 U.S. 692, 705, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981): in the context of a criminal investigation, officers may not exploit the detention of a building's occupants during a search of the premises, prolonging the detention to gain information from the detainees, rather than from the search. Conversely, the seizure in the instant case was not carried out in the context of a criminal investigation, nor was it pursuant to a criminal investigation and a search of the business premises authorized by a warrant. Thus, the legal principles upon which the *Ganwich* court found the officers' conduct to be in violation of clearly established law are inapposite to this case. As such, *Ganwich* does not illuminate the state of the law in October 2001 in a relevant manner.

Even if *Ganwich* had been decided by October 2001, there are key differences between it and this case such that a reasonable officer would not have fair warning of whether Plaintiffs' seizure was reasonable. Once again, the seizure in *Ganwich* was pursuant to a criminal investigation and a search of the business premises authorized by a warrant. Additionally, the detainees in *Ganwich* were held completely incommunicado for the length of their detention, unlike Plaintiffs here who were allowed to make certain arrangements by telephone. Third, in *Ganwich* it was clear that police officers were seizing private citizens, unlike here where Defendants could reasonably have thought that they were acting in their capacities as persons of higher rank and that Plaintiffs chose to stay at the school out of a fear of losing their jobs rather than under threat of arrest and prosecution for criminal acts.

This case did not provide a clear-cut constitutional violation, but only upon great reflection and analysis by the Court was that decision reached. The Court's extensive deliberation on the question of whether Plaintiffs' Fourth Amendment rights were violated is relevant in that the "analysis used to determine whether a plaintiff alleges a violation of a constitutional right is instructive in determining whether that right was clearly established." *Mena*, 332 F.3d at 1266; *Cox*, 359 F.3d at 1112. Moreover, whereas in most qualified immunity inquiries, courts are dealing with variations of fact patterns that fit into a general paradigm of legal principles, this case presents a series of facts that span a wide range of legal principles in a manner that heretofore has not been definitively adjudicated. Indeed, to this Court's knowledge, no published case has dealt with an amalgamation of fact and law in a manner that could put a police officer on fair warning of a person's rights in such a situation. The Court acknowledges the ample body of Fourth Amendment caselaw regarding arrests and other seizures pursuant to criminal investigations, workplace detentions, and the detention of minors by school officials. However, while some of the legal principles set forth in those cases are implicated here, such principles can only be applied to the peculiar facts of this case through complex legal reasoning.

The Court thus holds that a reasonable officer could have reasonably believed that a Fourth Amendment violation had not taken place. In sum, notwithstanding the Court's finding that when the facts are viewed in the light most favorable to Plaintiffs, Plaintiffs were unreasonably seized, a reasonable officer, given the state of the law on October 19, 2001, could have rea-

sonably but erroneously believed that Plaintiffs were not seized and that even if they were seized pursuant to a non-criminal internal investigation, such seizure was reasonable. Defendants receive the benefit of the doubt with respect to a reasonable mistake of law, and, therefore, Defendants are entitled to qualified immunity.

## V. Conclusion

Based on the foregoing, Defendants are, notwithstanding a potential violation of the Fourth Amendment, entitled to summary judgment because they have established qualified immunity from suit for their actions. In conjunction with the May 9 Order, Defendants' motion for summary judgment is now GRANTED in its entirety.

IT IS SO ORDERED.