**Elizabeth AGUILERA, et al., Plaintiffs,**

v.

**Leroy BACA, et al., Defendants.**

**No. CV 03–6328 SVW(CWX).**

United States District Court,
C.D. California.

Sept. 15, 2005.

---

Elizabeth J. Gibbons, John S. Birke, Green & Shinee, Encino, CA, for Plaintiffs.

Adrian J. Barrio, Paul B. Beach, Franscell Strickland Roberts & Lawrence, Glendale, CA, for Defendants.

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

WILSON, District Judge.

## I. INTRODUCTION

This case arose out of a complaint by a civilian that a deputy sheriff had assaulted him. An internal police investigation ensued in which Plaintiffs, deputies in the Los Angeles County Sheriff's Department, were asked or ordered to remain at work for questioning after their shifts had ended. After brief questioning by a member of the Internal Criminal Investigations Bureau, each deputy invoked his or her Fifth Amendment rights. Plaintiffs were subsequently taken off field duty and then reassigned to other shifts. No charges were ever filed against any of the Plaintiffs, and none of the Plaintiffs was ever forced to testify in any kind of proceeding.

As a result of this incident, Plaintiffs Elizabeth Aguilera ("Aguilera"), Phillip Arellano ("Arellano"), Benjamin Bardon ("Bardon"), Gustavo ("Gus") Carrillo ("Gus Carrillo"), and Hector Ramirez ("Ramirez") (collectively "Plaintiffs") filed the action for damages and injunctive relief under 42 U.S.C. §§ 1983 and 1988 on September 5, 2003 against Defendants Leroy Baca ("Baca"), William Stonich ("Stonich"), Larry Waldie ("Waldie"), Dennis Dahlman ("Dahlman"), William Sams ("Sams"), William McSweeney ("McSweeney"), Neil Tyler ("Tyler"), Thomas Angel ("Angel"), Arthur Ng ("Ng"), Alan Smith ("Smith"), Margaret Wagner ("Wagner"), Russell Kagy ("Kagy"), Brian Proctor ("Proctor"), the Los Angeles County Sheriff's Department ("LASD" or the "Department"), and the County of Los Angeles (the "County") (collectively "Defendants").

Plaintiffs allege violations of their Fourth Amendment right to be free from unreasonable seizures, their Fifth Amendment right against self-incrimination, their Fourteenth Amendment due process right to be free from coercive police questioning, and their Fourteenth Amendment due process right to be free from governmental conduct which shocks the conscience. Plaintiffs also allege conspiracy and municipal liability.

On June 6, 2005, Defendants filed Defendants' Motion for Summary Judgment, or in the Alternative, Motion for Partial Summary Judgment. On June 22, 2005, Plaintiffs filed their Memorandum of Points and Authorities in Opposition to Defendants' Motion for Summary Judgment.[1]

For the reasons set forth below, the Court GRANTS Defendants' Motion for Summary Judgment.

## II. FACTS [2]

On September 5, 2002, Plaintiffs were assigned to the East Los Angeles Sheriff's

---

1. The Court subsequently granted leave to the parties to supplement the record and file additional briefing.

2. As this is a motion for summary judgment, the Court must view the evidence in the light most favorable to Plaintiffs and draw all reasonable inferences in their favor. *See, e.g., Playboy Enters., Inc. v. Netscape Communications Corp.,* 354 F.3d 1020, 1023 (9th Cir. 2004). In this case, Plaintiffs have made the Court's task unnecessarily difficult by submitting two different statements of facts with no attempt having been made to integrate them. As a result, it is not clear whether the second statement of facts merely supplements the first or supplants it. Furthermore, Plaintiffs' supplemental statement of facts relies extensively on police reports prepared by Sgt. Kagy in November and December 2002. There are several evidentiary problems with these reports. First, while it is true that police re-

Station (the "Station") as patrol deputies. They were assigned to the early morning shift, with regularly scheduled hours from approximately 10:00 p.m. on September 4, 2002 to 6:00 a.m. or 7:00 a.m. on September 5, 2002.

The uniform of a patrol deputy consists of green pants and a tan shirt with no stripes on the sleeve. By contrast, a sergeant's uniform includes three stripes on the sleeve.

At around 1:30 a.m. on September 5, 2002, Plaintiffs and Deputy Joseph ("Joe") Carrillo ("Joe Carrillo") conducted a narcotics investigation at a residence near the intersection of Union Pacific Avenue and Indiana Street in East Los Angeles.[3] Sgt. Sean Burke ("Burke") supervised.

At around this same time, Martin Jamie Flores, a civilian (the "civilian"), called the Los Angeles Police Department ("LASD") from a pay phone near Union Pacific and Indiana to report that a single male deputy, possibly Hispanic, had struck him with a flashlight in the back and head. Paramedics were dispatched to the scene and transported the civilian to Doctor's Hospital.

Prior to this time, the civilian had been drinking in a bar next to the parking lot where the Plaintiffs were conducting their investigation. According to Plaintiffs, the civilian was visibly intoxicated when he exited the bar. Plaintiffs claim that the civilian repeatedly tried to talk to the suspects they were detaining and taunted Plaintiffs to free the suspects or arrest them.

At some point after 1:30 a.m., Watch Commander Abel Moreno ("Moreno") received a call from a LAPD sergeant who informed him that she was at Doctor's Hospital and a patient was alleging that he had been assaulted by a deputy sheriff. By this point, Sgt. Burke had returned to the Station. Having been informed of the civilian's allegations at the scene, Sgt. Burke notified Watch Commander Moreno. Together, they responded to Doctor's Hospital, verified the civilian's physical in-

ports may in certain circumstances be admissible as a business record, *see Woods v. City of Chicago,* 234 F.3d 979, 986 (7th Cir.2000), the proponent of the report has the burden of laying a foundation for their admission. In particular, the Ninth Circuit requires that a proponent establish, through "the testimony of the custodian of the records or other qualified witness," *United States v. Miller,* 771 F.2d 1219, 1237 (9th Cir.1985), that the business records were:

(1) made or based on information transmitted by a person with knowledge at or near the time of the transaction; (2) made in the ordinary course of business; and (3) trustworthy, with neither the source of the information nor method or circumstances of preparation indicating a lack of trustworthiness.

*United States v. Catabran,* 836 F.2d 453, 457 (9th Cir.1988) (citing *United States v. Miller,* 771 F.2d 1219, 1237 (9th Cir.1985)). In this case, Plaintiffs have proffered no testimony by any witness as to these foundational require-

ments. Moreover, the police reports were prepared by Sgt. Kagy two to three months after the interviews in question. Given the number of witnesses interviewed by Sgt. Kagy and the level of detail reflected in his reports, a two to three month delay is simply too great to satisfy the contemporaneity requirement of Fed.R.Evid. 803(6). *Cf. Mo. Pac. R. Co. v. Austin,* 292 F.2d 415, 423 (5th Cir.1961) ("The more it is a part of the regular duties of a person to interview many people in many different companies on many varied situations, the more imperative is the necessity for an early recording."). Finally, the reports are laced with hearsay statements which would not be covered by the business records exception. *See Woods,* 234 F.3d at 986 ("[The] business records exception does not embrace statements contained within a business record that were made by one who is *not* a part of the business if the embraced statements are offered for their truth.") (internal quotation marks omitted).

3. Deputy Joe Carrillo is not a plaintiff.

juries to his head and back, and took a videotaped statement from the civilian.[4]

The civilian told Sgt. Burke and Watch Commander Moreno that he was assaulted by a deputy sheriff—the civilian indicated that there were no stripes on the assailant's sleeves—while he was walking near Union Pacific Avenue and Indiana Street. The civilian also told them that he did not think there were any witnesses.

As a result of the civilian's complaint, the Department's Internal Affairs Bureau ("IAB") began an internal investigation into the matter. Watch Commander Moreno subsequently contacted Captain Thomas Angel ("Angel") at home and informed him of the civilian's allegation and injuries.

After IAB investigators contacted the civilian at Doctor's Hospital, it was determined that investigators from the Department's Internal Criminal Investigations Bureau ("ICIB") should become involved in the investigation.[5]

At some point between 5:30 a.m. and 6:00 a.m., Plaintiffs were directed to return to the Station and wait until investigators arrived. When Plaintiffs returned to the Station, they were advised or told by Watch Commander Moreno that they should remain at the Station until they could be interviewed by Department investigators.[6]

The Department has two separate internal investigations units: IAB, which investigates administrative allegations, and ICIB, which investigates criminal allegations. Plaintiffs were aware of the difference on September 5, 2002.

By 6:00 a.m., Defendants had determined that the civilian's allegations would be investigated by ICIB. At around this same time, Sgt. Burke and Watch Commander Moreno told Plaintiff Aguilera that the civilian's allegations would be investigated criminally.

Sometime before 7:00 a.m., Captain Angel telephoned Commander Neal Tyler ("Tyler") to discuss the allegations.[7] Captain Angel related the information he obtained from Sgt. Moreno. Captain Angel also told Commander Tyler that the deputies would be at the station until they could be interviewed by ICIB investigators.

Between approximately 7:00 and 7:45 a.m., ICIB Lt. Allan Smith ("Smith") called ICIB Sgt. James Russell Kagy ("Kagy") at home, informed him of the nature of the investigation, and ordered him to report to ICIB to conduct an investigation.

At about 8:00 a.m., Sgt. Kagy and his partner, Deborah Jones, reported to ICIB, where they received a briefing from Lt. Smith. Lt. Smith told Sgt. Kagy that the assault occurred in the vicinity of a narcotics investigation at Union Pacific Avenue and Indiana Street and identified by name the deputies who had been involved in the investigation. Sgt. Kagy and Jones then began a preliminary investigation and proceeded directly to Doctor's Hospital to contact the civilian.

4. The videotaped interview took place at approximately 3:50 a.m.

5. Plaintiffs' supplemental statement of facts includes details of the IAB investigators' interview with the civilian. However, since these details derive from hearsay statements contained in the inadmissible police reports, they are inadmissible.

6. Plaintiffs claim that they were advised that the investigation was "going criminal," which they understood to mean that investigators from ICIB would be coming to the station to interview them. Although Defendants dispute this claim, the Court accepts Plaintiffs' testimony on this point.

7. At the time, Commander Tyler was the Acting Chief of Field Operations Region One.

After arriving at Doctor's Hospital, Sgt. Kagy learned that the civilian had been released and was with IAB Sgt. Darryl Meeks ("Sgt.Meeks"). Sgt. Kagy proceeded to the civilian's location, received a briefing from Sgt. Meeks, and interviewed the civilian. The civilian told Sgt. Kagy that he had been hit several times in the back of the head and several other places by a deputy while he was walking on Union Pacific Avenue near Indiana Street and that the assault had occurred after a verbal exchange between the civilian and a deputy.

Sgt. Kagy then accompanied the civilian to the scene of the alleged assault. At the scene of the alleged assault, the civilian provided Sgt. Kagy with a reenactment of how the assault occurred, including a description of where the involved deputy was prior to the assault, the location of the pay phone from which the civilian called 911, and a description of the uniform ("beige and green with no stripes on the sleeve") that the deputy was wearing. As soon as Sgt. Kagy finished his preliminary investigation and interview of the civilian at the scene, he went directly to the Station to interview Plaintiffs. He arrived at the Station shortly before 11:30 a.m.

When Plaintiffs and Deputy Joe Carrillo returned to the Station between 5:30 and 6:00 a.m., they initially gathered in the Station's report writing room. However, at some point between 5:30 a.m. and 6:30 a.m., some of the Plaintiffs were moved to the basement briefing room. During this time, Plaintiffs were under the supervision of other sheriff's department personnel, although Plaintiffs' deposition testimony indicates that the supervision was less than constant.[8]

At approximately 6:30 a.m., Plaintiffs were directed to go to Captain Angel's office. According to Plaintiffs, Captain Angel pointed at Plaintiffs and told them in a "harsh, accusatory tone" that (1) he knew one of them had assaulted the civilian, (2) the others were covering it up, (3) one or more of them would be going to prison and would lose their jobs, and (4) the only way to avoid going to jail was to "come forward" by giving a statement to ICIB investigators. Captain Angel concluded by ordering Plaintiffs not to leave the Station and to wait in the COPS Team office until they gave a statement to the ICIB investigators.[9]

For the next five hours, Plaintiffs waited in the COPS Team office. During this time, Plaintiffs were supervised by either Lt. Wagner or Sgt. Proctor, both of whom were uniformed and armed, as were Plaintiffs. While Plaintiffs claim that the supervision was constant, their deposition testimony indicates that the supervision was somewhat more intermittent.[10] Moreover, while Plaintiffs claim that they were not allowed to get anything to eat or drink, their own testimony indicates that one or

---

8. For instance, Plaintiff Aguilera states that she only spent about fifteen minutes in the report writing room, with the rest of the time spent in the locker room and the secretary's office. (Aguilera Depo. 12:16–13:2.)

9. Although Defendants dispute this claim, the Court accepts Plaintiffs testimony on this point.

10. It appears that Lt. Wagner and Sgt. Proctor would periodically look in or walk into the office. For instance, Plaintiff Arellano stated

that Sgt. Proctor simply "walk[ed] in, survey[ed], look[ed] at all of us, [and] walk[ed] out." (Arellano Depo. 69:2–5.) Likewise, Plaintiff Ramirez offered the following account of Lt. Wagner's activities:

[She][t]alked to Sgt. Burke, looked at some papers from Sgt. Burke, [we] listened to her tell us about the bathroom and tell us about if we want anything to eat or drink, she'll get it for us, [we] watch[ed] her poke her head in a couple of times and leave. That's about it.

(Ramirez Depo. 76:19–77:3.)

two of them used the water foundation and that either/both Lt. Wagner or/and Sgt. Proctor asked Plaintiffs if they wanted anything to eat or drink.[11] In addition, Plaintiffs were permitted to use the restroom without an escort and were never placed in handcuffs.

During this time, Plaintiffs were not put through the Department's booking or arrest procedures and were not prevented from telephoning their attorney.[12] In addition, Plaintiffs remained in possession of their LASD-issued equipment, including their weapons, and personal belongings. Indeed, several of the Plaintiffs remained in uniform.[13]

Between approximately 11:30 a.m. and 12:00 p.m., Sgt. Kagy questioned each Plaintiff individually. Sgt. Kagy asked each Plaintiff if he or she would provide him with a statement, and each declined based on the advice of counsel.[14] After each Plaintiff declined to provide a statement, Sgt. Kagy terminated the interview and Plaintiffs left the Station shortly thereafter.

Prior to leaving, each Plaintiff filled out an overtime slip. Plaintiffs were subsequently paid their normal overtime pay for the approximately six hours they were held at the Station beyond the scheduled end of their shift.

When each Plaintiff reported for his or her next shift after September 5, 2002, Lt. Smith informed him or her that his or her shift was being changed effective immediately. Plaintiffs were also pulled from patrol duty. Plaintiffs were not restored to field duty until October 2003.

Plaintiffs claim their duties and shifts were changed in retaliation for their refusal to answer Sgt. Kagy's questions. They maintain that their original shifts and duties were restored in October 2003, not because they had been cleared of wrongdoing, but because they had finally given statements to the investigators. Defendants argue in response that Plaintiffs' duties and shifts were changed as a result of the internal investigation.

On September 5, 2002, Plaintiffs were experienced deputy sheriffs. Plaintiff Bardon became a sworn deputy with the Department in 1981. Plaintiff Aguilera became a sworn deputy in 1990. Plaintiff Ramirez became a sworn deputy in 1995. Plaintiff Arellano became a sworn deputy in 1989. Plaintiff Gus Carrillo became a sworn deputy in 1996. As a result of their experience with the Department, Plaintiffs were familiar with the Department's policies and practices regarding placing individuals under arrest.

## III. LEGAL STANDARD

### A. Summary Judgment

Fed.R.Civ.P. 56(c) requires summary judgment for the moving party when the

---

11. For instance, Plaintiff Aguilera testified that Sgt. Proctor asked Plaintiffs if anyone was hungry and that Sgt. McLeod asked if anyone wanted anything to eat or drink. (Aguilera Depo. 68:1–8;68:23–69:7.) Likewise, Plaintiff Ramirez testified that Lt. Wagner asked Plaintiffs if they wanted anything to eat or drink. (Ramirez Depo. 76:19–77:3.) In addition, Plaintiff Arellano testified that he "stopped briefly to use [the water fountain]." (Arellano Depo. 75:21–25.) Plaintiff Bardon also testified that he "might have drank some water out of the water fountain." (Bardon Depo. 77:2–3.)

12. At 11:00 a.m. one of the Plaintiffs used a cell phone to contact their attorney.

13. Plaintiff Aguilera changed out of her uniform and placed her duty weapon in her locker before being ordered to wait for the investigators.

14. Sgt. Kagy told Plaintiffs Bardon, Carrillo, Ramirez, and Arellano that they were not suspects but could not be eliminated as suspects.

evidence, viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Tarin v. County of Los Angeles,* 123 F.3d 1259, 1263 (9th Cir. 1997). "A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the parties' differing versions of the truth." *SEC v. Seaboard Corp.,* 677 F.2d 1301, 1306 (9th Cir. 1982).

The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). However, if the moving party will not bear the burden of proof at trial, it may satisfy its burden at summary judgment by " 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. 2548. Once the moving party has met its initial burden, Fed. R.Civ.P. 56(e) requires the nonmoving party to go beyond the pleadings and identify specific facts that show a genuine issue for trial. *See id.* at 323–34, 106 S.Ct. 2548; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Only genuine disputes—where the evidence is such that a reasonable jury could return a verdict for the nonmoving party—over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. *See Anderson,* 477 U.S. at 248, 106 S.Ct. 2505, 91 L.Ed.2d 202.

### B. Qualified Immunity

In a suit against an officer for an alleged violation of a constitutional right, the court must consider, as a threshold matter, whether the officer is entitled to qualified immunity. *Saucier v. Katz,* 533 U.S. 194, 200, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Qualified immunity is appropriate if the facts, taken in the light most favorable to the plaintiff, show that the officer's conduct did not violate a clearly established constitutional right. *Id.* at 201, 121 S.Ct. 2151; *Jeffers v. Gomez,* 267 F.3d 895, 909 (9th Cir.2001).

In ruling on a motion for summary judgment based on qualified immunity, a court must engage in two-step inquiry. *Walker v. Gomez,* 370 F.3d 969, 974 (9th Cir.2004). First, the court must determine whether the facts, taken in the light most favorable to the plaintiff, show that the officer's conduct violated a constitutional right. *Martinez v. Stanford,* 323 F.3d 1178, 1183 (9th Cir.2003) (quoting *Saucier,* 533 U.S. at 201–02, 121 S.Ct. 2151, 150 L.Ed.2d 272). Second, the court must determine whether the right was "clearly established." *Id.*[15]

A right is clearly established for purposes of qualified immunity when a reasonable officer, faced with the circumstances the officer confronted, would have known that the conduct attributed to the officer was unlawful. *Saucier,* 533 U.S. at 202, 121 S.Ct. 2151, 150 L.Ed.2d 272. In determining whether the right was clearly established, a court must define the right with sufficient particularity, keeping in mind the specific set of circumstances the officer encountered. *Id.* at 201–02, 121 S.Ct. 2151.

### IV. DISCUSSION

Defendants move for summary judgment with respect to Plaintiffs' Fourth Amendment, Fifth Amendment, Fourteenth Amendment, conspiracy, and mu-

---

**15.** Of course, if the officer's conduct did not violate the plaintiff's constitutional rights, the inquiry is at an end. *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151, 150 L.Ed.2d 272.

nicipal liability claims. Defendants maintain that Plaintiffs' rights were not violated and that, even if they were, the law was not clearly established at the time that Defendants' conduct constituted a violation of Plaintiffs' constitutional rights. Plaintiffs oppose.

### A. Fourth Amendment

### 1. Legal Principles

■ The Fourth Amendment protects citizens against "unreasonable searches and seizures." U.S. Const. amend. IV. "A seizure of the person within the meaning of the Fourth and Fourteenth Amendments occurs when, taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." *Kaupp v. Texas*, 538 U.S. 626, 629, 123 S.Ct. 1843, 155 L.Ed.2d 814 (2003) (internal quotations omitted). Thus, an encounter between an officer or other government official and an individual "will not trigger Fourth Amendment scrutiny unless it loses its consensual nature." *Florida v. Bostick*, 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991).

■ Though an individual need not be arrested in order for a seizure of the person to have occurred[16], the restraint on liberty typically must be effected by physical force or a show of lawful authority. *California v. Hodari D.*, 499 U.S. 621, 626–27, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991); *Terry v. Ohio*, 392 U.S. 1, 19, 88 S.Ct. 1868, 1879 n. 16, 20 L.Ed.2d 889 (1968) ("Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred"). The Ninth Circuit considers five factors in determining whether a show of force amounted to a seizure: (1) the number of officers, (2) whether weapons were displayed, (3) whether the encounter occurred in a public or non-public setting, (4) whether the officer's officious or authoritative manner would imply that compliance would be compelled, and (5) whether the officers advised the detainee of his right to terminate the encounter. *United States v. Washington*, 387 F.3d 1060, 1068 (9th Cir.2004); *accord Kaupp*, 538 U.S. at 630, 123 S.Ct. 1843, 155 L.Ed.2d 814 (identifying several factors or indicia which might indicate the existence of a seizure, "including 'the threatening presence of several officers, the display of

---

**16.** There are two types of seizures under the Fourth Amendment: (1) investigatory stops or detentions and (2) arrests. *Allen v. City of Portland*, 73 F.3d 232, 235 (9th Cir.1995). An investigatory stop or detention occurs when an officer briefly seizes an individual for questioning based upon a "reasonable suspicion, based on objective facts, that the individual is involved in criminal activity." *Brown v. Texas*, 443 U.S. 47, 51, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979). The Fourth Amendment allows such stops "so long as [the police] have a reasonable, articulable suspicion that justifies their actions." *Gallegos v. City of Los Angeles*, 308 F.3d 987, 990 (9th Cir.2002).

In contrast to an investigatory stop or detention, a full-scale arrest must be supported by probable cause. *Allen*, 73 F.3d at 236. "There is no bright line rule for determining

when an investigatory stop crosses the line and becomes an arrest." *Gallegos*, 308 F.3d at 991 (internal quotation marks omitted). Rather, a court must consider the totality of the circumstances. *Allen*, 73 F.3d at 235. In particular, a court must consider not only how intrusive the stop was but "whether the methods used by the police were reasonable given the particular circumstances." *Gallegos*, 308 F.3d at 991 (internal quotation marks omitted) (emphasis in original). There is no "'mechanical checklist'" to distinguish between investigatory stops and arrests, *id.* (quoting *United States v. Parr*, 843 F.2d 1228, 1231 (9th Cir.1988)), and there is "'no rigid time limit[]'" on investigatory stops. *Id.* at 992 (quoting *United States v. Sharpe*, 470 U.S. 675, 685, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985)).

a weapon by an officer, some physical touching of the person of the citizen, and the use of language or tone of voice indicating that compliance with the officer's request might be compelled'") (quoting *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980)).

■ The application of the Fourth Amendment to the employment context presents special issues. This is because a court, in determining whether a seizure has occurred, must be attuned to the fact that an individual's voluntary choices may give rise to a limitation on his freedom that does not equate to a seizure by law enforcement. For instance, the mere fact that an employee does not flee his place of work when police officers arrive to conduct an investigation does not mean that the employee has been seized for purposes of the Fourth Amendment. As the Supreme Court has noted, "[W]hen people are at work their freedom to move about has been meaningfully restricted, not by the actions of law enforcement officials, but by the workers' voluntary obligations to their employers." *INS v. Delgado*, 466 U.S. 210, 218, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984).

■ This principle is no less applicable in the public employment context. As one court has put it, "[T]he obligation to remain at work does not become less voluntary when owed to a public agency." *Rossi v. Town of Pelham*, 35 F.Supp.2d 58, 71 (D.N.H.1997). Accordingly, while it is well-established that "searches and seizures by government employers or supervisors of the private property of their employees ... are subject to the restraints of the Fourth Amendment," *O'Connor v. Ortega*, 480 U.S. 709, 715, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987), it is reasonably clear that "the possibility or even probability of adverse employment action—as opposed to physical detention—cannot enter [the] analysis" as to whether a government

employee has been seized. *Driebel v. City of Milwaukee*, 298 F.3d 622, 642 (7th Cir. 2002). Thus, "in cases involving the constitutional rights of police officers, courts must distinguish between a police department's actions in its capacity as an employer and its actions as the law enforcement arm of the state." *Id.* at 637.

Of course, the mere fact that a seizure has occurred does not mean that a violation of the Fourth Amendment has. *See Moreno v. Baca*, 400 F.3d 1152, 1156 (9th Cir.2005) ("The Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable."). A seizure violates the Fourth Amendment only if it was objectively unreasonable under the circumstances. *Doe v. State of Haw. Dep't of Educ.*, 334 F.3d 906, 909 (9th Cir.2003).

In order to be reasonable within the meaning of the Fourth Amendment, an arrest must be based on probable cause. *Allen*, 73 F.3d at 236. Probable cause exists "when the facts and circumstances within the officer's knowledge are sufficient to warrant a prudent person to believe 'that the suspect has committed, is committing, or is about to commit an offense.'" *Barry v. Fowler*, 902 F.2d 770, 773 (9th Cir.1990) (quoting *Mich. v. DeFillippo*, 443 U.S. 31, 37, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979)). Probable cause must be determined at the time of the arrest; evidence obtained later or as a result of the arrest cannot be used to support the existence of probable cause. *Allen*, 73 F.3d at 236.

In order to be reasonable, an investigatory stop must be based on a "reasonable suspicion, based on objective facts, that the individual is involved in criminal activity." *Brown*, 443 U.S. at 51, 99 S.Ct. 2637, 61 L.Ed.2d 357. "The reasonable suspicion standard 'is a less demanding standard than probable cause,' and merely requires

'a minimal level of objective justification.'" *Gallegos,* 308 F.3d at 990 (quoting *Illinois v. William,* 528 U.S. 119, 123, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000)). Nevertheless, the officer "must have a *particularized* suspicion of illegal activity." *United States v. Bravo,* 295 F.3d 1002, 1011 n. 8 (9th Cir.2002) (emphasis added).

2. *Analysis*

a. *Were Plaintiffs Seized Within the Meaning of the Fourth Amendment?*

■ As a threshold matter, the Court must determine whether Plaintiffs were seized within the meaning of the Fourth Amendment. In making this determination, the Court is guided by the Seventh Circuit's decision in *Driebel v. City of Milwaukee,* 298 F.3d 622 (7th Cir.2002), a case also involving allegations by experienced police officers that they had been unlawfully seized as part of an internal affairs investigation.

In *Driebel,* 298 F.3d at 627, four police officers alleged that they had been seized within the meaning of the Fourth Amendment "when they were ordered by superior officers to remain on duty or to accompany detectives to the [Milwaukee Police Department's] Internal Affairs Division and answer questions put to them during the course of criminal investigations of their activity while on duty in January and February 1998." Because the case involves two unrelated incidents involving four different officers, the court analyzed them separately.

On February 20, 1998, Officer Robert Driebel ("Driebel") was assigned to plainclothes duty during a daytime patrol shift from 7 a.m. to 3 p.m. *Id.* at 628. At 1:15 p.m., the MPD received an emergency call from the principal of a local elementary school that an "older kid" was "across the street bothering kids at the school." *Id.* Officer Driebel and his partner were dispatched to the scene. *Id.* Officer Driebel and his partner took a statement from the principal, who told them that two boys were making obscene gestures and statements to the students. *Id.* According to the principal, the boys fled and ran into a house across the street when she went to the playground to investigate. *Id.* Officer Driebel and his partner drove to the house. *Id.* When no one answered, they went back to the school to talk to students who had reportedly witnessed the incident. *Id.* After taking the statements, they returned to the house to monitor it. *Id.* Two boys matching the students' description exited the house and entered an adjoining alley. *Id.* Officer Driebel and his partner attempted to follow the boys by car, but when the boys took off running in opposite directions. *Id.* A chase ensued. *Id.* After losing one of the boys, Officer Driebel happened to spot him again. *Id.* Officer Driebel ordered the boy to stop, but the boy started to run away. *Id.* Officer Driebel started to chase him, but eventually grew tired and out of frustration threw his MPD-issued radio at the boy, striking him in the head. *Id.* Despite the injury, the boy kept running. *Id.* at 628–29. Later, the father of one of the boy filed a complaint with the MPD. *Id.* at 629.

After hearing the statements of the two boys, the investigating officer suspected that Officer Driebel was the individual who threw the radio. *Id.* After locating Driebel, he ordered Driebel to "stand by" in the police garage until given further instructions. *Id.* Driebel obeyed, waiting in the garage for what ultimately totaled four hours. *Id.* During this time, Driebel retained possession of his I.D. card, badge, and all police-issued equipment. *Id.* No one was assigned to monitor his presence, and there is no evidence Driebel was prevented from communicating with anyone during this time. *Id.* Moreover, Driebel subsequently received overtime pay for the time he was in the garage. *Id.*

In January 1998, Officers Brett Huston ("Huston"), Johnny Sgrignuoli ("Sgrignuoli"), and Stephen Pinchard ("Pinchard") were each assigned to the Gang Crimes Division of the MPD. *Id.* at 632. While on duty on January 21, Huston and Pinchard made a traffic stop of a vehicle for failing to stop at a traffic signal. *Id.* One of the four passengers was Miguel Ramos ("Ramos"), a Latino male known to have gang affiliations. *Id.* On January 23, MPD Assistant Chief Paul Koleas ("Asst. Chief Koleas") notified Deputy Inspector Dale Schunk ("Deputy Insp. Schunk") that two officers had pulled over a vehicle with four occupants, observed marijuana lying on the ground next to the car, and allegedly threatened to arrest the occupants unless one of them agreed to obtain a single handgun for them. *Id.* That same day, the Internal Affairs Division ("IAD") learned that Ramos had filed a complaint containing substantially the same allegations *Id.* After reviewing the relevant records, IAD concluded that Huston and Pinchard were involved in the Ramos traffic stop. *Id.* Ramos further informed the IAD detectives that Huston had paged him several times the following day. *Id.* at 632–33. At this point, the IAD launched an investigation to determine whether Huston or Pinchard might be guilty of the crime of misconduct in public office. *Id.* at 633.

In an attempt to determine the truth of the allegations, a sting operation was arranged for the early evening of January 29, 1998. *Id.* On that day, Huston, Pinchard, and Sgrignuoli were working the 5 p.m. to 1 a.m. shift on Milwaukee's south side. *Id.* As part of the sting, two handguns were placed in a dumpster on the corner of South 14th and West Mitchell. *Id.* At the instruction of the IAD, Ramos telephoned Huston and advised him that the guns were in the dumpster. *Id.* After receiving the information, Huston and Sgrignuoli drove to the location. *Id.*

Sgrignuoli exited the squad car, retrieved the firearms, and placed them in the back end of the police car. *Id.* Upon observing the activity, two unmarked police cars pulled up. *Id.* Two officers exited the cars and immediately separated Huston and Sgrignuoli. *Id.*

One of the officers accompanied Sgrignuoli to the IAD offices at police headquarters in downtown Milwaukee. *Id.* at 633–34. Upon their arrival, the officer escorted Sgrignuoli to a room that was inaccessible to the general public and relatively isolated from other parts of the building. *Id.* at 634. The two remained in the room for two hours before two other IAD detectives entered the room and read Sgrignuoli his *Mirandi* rights. *Id.* The two officers then left, leaving Sgrignuoli alone with the officer. *Id.* Thirty minutes later, Deputy Insp. Schunk and three other IAD officers came in and informed Sgrignuoli that he was under investigation for MPD rule violations rather than criminal conduct. *Id.* Thereafter, Sgrignuoli was directed to leave and return to duty. *Id.* However, he requested to take the rest of the evening off, and his request was granted. *Id.* During the time he spent with the officer, Sgrignuoli asked what was happening; both times the officer refused to answer his queries. *Id.* Sgrignuoli was eventually paid for the time he spent waiting with the officer. *Id.*

The other officer accompanied Huston to the IAD offices. *Id.* Like Sgrignuoli, Huston was taken to an empty room, where he waited with the other officer for three hours. *Id.* at 635. The officer advised Huston that he was the subject of a criminal investigation, but refused to allow Huston to contact his attorney or union representative. *Id.* In addition, Huston was refused permission to use the bathroom unless accompanied by a detective. *Id.* After approximately three hours, an IAD detective entered the room and read Hu-

ston his *Miranda* rights. *Id.* Huston immediately requested an attorney. *Id.* Like Sgrignuoli, Huston was compensated for the time he spent with the officer. *Id.* Moreover, he was never relieved of the possession of his police-issued credentials and weapons, including his gun, I.D. card, and badge. *Id.*

Unlike his cohorts, Pinchard was allowed to drive himself to the IAD offices and go to the office on the third floor unaccompanied by any detective. *Id.* at 636. Moreover, almost immediately upon entering the office, Pinchard was read his *Miranda* rights and exercised his right to remain silent. *Id.* He remained in the room for thirty minutes, after which he was ordered to return to duty. *Id.*

In the end, the Seventh Circuit found that only one of the officers had been seized within the meaning of the Fourth Amendment. With respect to Officer Driebel, the court concluded that he had not been seized within the meaning of the Fourth Amendment when he was ordered to remain on "stand by" duty for three and a half hours in the garage. *Id.* at 642–43. In reaching its conclusion, the court noted that (1) no one prevented Driebel from leaving the garage, (2) Driebel received overtime pay, (3) Driebel retained possession of his police-issued equipment, including his gun, police identification card, badge, and locker room keys, and (4) there was no evidence that the MPD had created a coercive environment by isolating Driebel or reading him his *Miranda* rights or advising him that he was under criminal investigation. *Id.*

With respect to Officer Pinchard, the court had little difficulty finding that he was not seized within the meaning of the Fourth Amendment. *Id.* at 646. The

court noted that he drove himself to the IAD offices, waited for only about thirty minutes, and was immediately returned to duty thereafter. *Id.* Under the circumstances, the court found his Fourth Amendment claim "without merit." *Id.*

With respect to Officer Huston, the court found that he had not been seized within the meaning of the Fourth Amendment when he was accompanied to the IAD offices by the officer or when he was forced to wait for three hours at the IAD offices. *Id.* at 646–49. The court justified its conclusion that his initial encounter with the officer and drive to the IAD offices was not a seizure on the grounds that (1) the detectives made no display of their weapons, (2) the detectives did not speak in a menacing manner or make coercive statements, (3) Huston remained in possession of his MPD-issued equipment at all time, (4) Huston was not touched, and (5) Huston would have known, as a highly trained MPD officer, that MPD regulations provided that IAD detectives were vested with the power and authority to interview officers at any time and place but that force could not be used to force an officer to submit to an interview or prevent him from departing from one unless he was formally arrested. *Id.* at 646–47. The court in turn justified its conclusion that the Huston was not seized when he was required to wait three hours in the IAD office on the grounds that (1) Huston was not physically restrained, (2) Huston retained possession of his MPD-issued equipment, including his weapons, identification cards, and badges, and (3) Huston was compensated for the time he spent at headquarters. *Id.* at 647–48.[17]

With respect to Officer Sgrignuoli, the court found that he had been seized within

---

**17.** The court acknowledged that the denial of Huston's request to contact his attorney or union representative weighed against a finding of no seizure, but it ultimately discounted the significance of this fact. *Id.* at 648. Moreover, while the court found it troubling that Huston was not permitted to use the restroom without the presence of another de-

the meaning of the Fourth Amendment. *Id.* at 649. The court reached this conclusion based solely upon testimony that the officer who initially accosted Sgrignuoli physically grabbed him and turned him around. *Id.* In the court's view, a person in Sgrignuoli's position could have thought, based upon the officer's grabbing and turning him, that he was not free to leave. *Id.*

In light of *Driebel,* the Court concludes that Plaintiffs were not seized when they were ordered to remain at work to be questioned by ICIB investigators.[18] First, no force was used: Plaintiffs were never handcuffed, physically restrained, or placed in a holding cell. Second, the show of force was distinctly benign: only two officers supervised Plaintiffs, and their supervision of Plaintiffs appears to have been intermittent and not particularly intrusive. For instance, Plaintiffs were permitted to talk to one another, use their cell phones, drink from the water foundation, and use the bathroom unaccompanied by an escort.[19] Third, Plaintiffs retained possession of their LASD-issued equipment, *including their guns.* Under these circumstances, it cannot be concluded that Plaintiffs were arrested or seized.[20]

---

tective, it ultimately discounted the significance of this fact. *Id.*

18. The Court does not find the facts of this case analogous to those in *Myers v. Baca,* 325 F.Supp.2d 1095 (C.D.Cal.2004). First, unlike the trainees in *Myers,* Plaintiffs were experienced law enforcement officers. Second, unlike the trainees, Plaintiffs did not have their personal belongings opened up and searched. Third, unlike the trainees, Plaintiffs were not told to speak to anyone, not to use their cell phones, not to eat or drink, and not to go to the restroom without an escort. Of course, unlike the trainees, Plaintiffs were told at the outset that they were under criminal investigation. The mere fact that a person is told he is under criminal investigation, however, does not suffice to give rise to a seizure where other factors weigh heavily against such a finding. In *Driebel,* for instance, Officer Huston was told shortly after he arrived that he was under criminal investigation. *Driebel,* 298 F.3d at 635. Nevertheless, the court found that no seizure had taken place. *Id.* at 646–49. Moreover, Plaintiffs were told they were under criminal investigation by a superior officer, not an ICIB officer. Finally, the fact that Captain Angel may have spoken in a harsh and accusatory tone does not alter the analysis. As one court has observed, "A supervisor may even use a harsh tone of voice and occasionally may 'order' an employee to do something. However, no one would think to argue in this situation that the employee was 'seized' under the Fourth Amendment." *Fedanzo v. Vroustouris,* 2001 WL 1242841, at *9 (N.D.Ill. Oct. 17, 2001).

19. In contrast, Officer Huston was not permitted to contact his attorney or go to the bathroom unaccompanied by an escort.

20. Indeed, the only factor which arguably weighs in favor of a seizure is the fact that Plaintiffs were told that they were under criminal investigation. However, as noted at *supra* note 18, Officer Huston was told shortly after he arrived at IAD offices that he was under criminal investigation. *Driebel,* 298 F.3d at 635. Nevertheless, the court there found that no seizure had taken place. *Id.* at 646–49. Moreover, unlike *Myers,* 325 F.Supp.2d at 1106, or *Driebel,* 298 F.3d at 635, Plaintiffs were told they were under criminal investigation by a superior, not an internal affairs' investigator. Thus, the argument for a seizure is even weaker here. Of course, Plaintiffs have may feared possible employment-related repercussions if they tried to leave, but fear of possible adverse job-related consequences cannot enter into the analysis of whether Plaintiffs were seized within the meaning of the Fourth Amendment. As the Seventh Circuit observed in *Driebel,* "[I]n cases involving the constitutional rights of police officers, courts must distinguish between a police department's actions in its capacity as employer and its actions as the law enforcement arm of the state." *Driebel,* 298 F.3d at 637. As an employer, a police department may, without violating the Fourth Amendment, order an officer to report for questioning at a designated, centralized area or some other suitable location. *Id.* Accordingly, the relevant inquiry under the

*b. Was the Seizure Unreasonable?*

Because the Court has concluded that no seizure occurred, it need not reach the issue of whether the seizure was reasonable.

**B. Fifth Amendment**

*1. General Principles*

■ The Self–Incrimination Clause of the Fifth Amendment provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V.[21] As interpreted by the Supreme Court, the privilege against self-incrimination protects an individual against not only being compelled to testify against herself in a criminal proceeding but being forced to testify against herself in any other proceeding, criminal or civil, administrative or judicial, investigatory or adjudicatory, where her answers might incriminate her in a future criminal proceeding. *Lefkowitz v. Turley*, 414 U.S. 70, 77, 94 S.Ct. 316, 322, 38 L.Ed.2d 274 (1973); *Kastigar v. United States*, 406 U.S. 441, 444–45, 92 S.Ct. 1653, 1656, 32 L.Ed.2d 212 (1972).

■ An individual may be compelled to testify against herself, however, where the threat of future prosecution has been removed. *Hiibel v. Sixth Jud. Dist. Court of Nev., Humboldt County*, 542 U.S. 177, 124 S.Ct. 2451, 2460–61, 159 L.Ed.2d 292 (2004); *see also Lefkowitz*, 414 U.S. at 84, 94 S.Ct. 316, 38 L.Ed.2d 274 (noting that testimony may be compelled if neither it nor its fruits are available for use). Accordingly, where the government grants a witness immunity from the future use of her testimony and any evidence derived

from it, the government may compel the witness to testify against herself. *See Kastigar*, 406 U.S. at 453, 92 S.Ct. 1653, 32 L.Ed.2d 212; *see also Chavez v. Martinez*, 538 U.S. 760, 767–78, 123 S.Ct. 1994, 155 L.Ed.2d 984 (2003).

■ Where the government compels a witness to testify against herself without officially granting the witness immunity, the witness is nevertheless shielded; the government may not use her testimony or any evidence derived from it in any subsequent criminal proceeding. *See Garrity v. New Jersey*, 385 U.S. 493, 500, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967). This immunity arises automatically and is co-extensive with the use and derivative use immunity mandated by *Kastigar*. *Chavez v. Martinez*, 538 U.S. at 769, 123 S.Ct. 1994, 155 L.Ed.2d 984; *see also Wiley v. Mayor & City Council of Baltimore*, 48 F.3d 773, 777 n. 7 (4th Cir.1995) (noting that the *Garrity* immunity, as it has become known, is self-executing).

*2. The Fifth Amendment in the Public Employment Context*

■ The application of the Fifth Amendment privilege against self-incrimination presents special problems when the witness is a government employee who is being called upon to testify to on-the-job or job-related misconduct which is also potentially criminal. In a series of cases involving the Fifth Amendment rights of public employees, the Supreme Court has made it clear that public employees "are entitled, like all other persons, to the benefit of ... the privilege against self-incrimination." *Uniformed Sanitation Men*

Fourth Amendment is not whether a reasonable person in the officer's position would have feared for his or her job but whether he or she "would have feared *seizure or detention* if [he or she] had refused to obey the commands given by [his or her] superior officers." *Id.* at 642 (emphasis in original). Here, the

evidence simply does not support the reasonableness of such fears.

**21.** The Self–Incrimination Clause applies to the states through the Fourteenth Amendment. *Malloy v. Hogan*, 378 U.S. 1, 8, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964).

*Ass'n v. Comm'r of Sanitation of the City of New York,* 392 U.S. 280, 284–85, 88 S.Ct. 1917, 20 L.Ed.2d 1089 (1968). Nevertheless, these cases make it equally clear that, as the Seventh Circuit has recently observed, "nothing in the [Fifth] Amendment endows public employees with greater workplace rights than those enjoyed by their counterparts in the private sector." *Driebel,* 298 F.3d at 637.

Because Plaintiffs' Fifth Amendment claim turns in large measure on a careful reading of these cases, the Court pauses to consider them. In *Garrity,* several New Jersey police officers were given the choice of either providing incriminating testimony or losing their jobs. *Garrity,* 385 U.S. at 497, 87 S.Ct. 616, 17 L.Ed.2d 562. The officers gave the incriminating testimony and were subsequently convicted based in part upon their testimony. *Id.* at 495, 87 S.Ct. 616.[22] On appeal, the Supreme Court held that the officers' testimony, because it had been given under the threat of discharge, was not voluntary and thus could not be used against them at trial. *Id.* at 497–500, 87 S.Ct. 616.

In *Gardner v. Broderick,* 392 U.S. 273, 274, 88 S.Ct. 1913, 20 L.Ed.2d 1082 (1968), a New York patrolman was given the choice of either waiving his *Garrity* immunity and testifying before a grand jury or losing his job. When the patrolman refused to waive his immunity, he was discharged. *Id.* On appeal, the Supreme Court held that the officer could not be discharged for refusing to waive his immunity. *Id.* at 279, 88 S.Ct. 1913. *Accord Uniformed Sanitation Men,* 392 U.S. at 283–84, 88 S.Ct. 1917, 20 L.Ed.2d 1089.

Taken together, *Garrity, Gardner,* and *Uniformed Sanitation Men* establish several propositions. First, *Garrity* establishes that testimony given under the threat of discharge constitutes compelled testimony within the meaning of the privilege against self-incrimination and thus may not be used in a subsequent criminal prosecution. This is the so-called *Garrity* immunity which automatically attaches to compelled testimony. Second, *Gardner* and *Uniformed Sanitation Men* establish that a governmental employer may not get around the self-executing *Garrity* immunity by threatening to terminate an employee for refusing to waive her *Garrity* immunity prior to testifying. Third, both *Gardner* and *Uniformed Sanitation Men* make it clear that a governmental employer may terminate an employee for refusing to answer questions regarding the performance of her duties so long as the employer does not terminate or threaten to terminate the employee for refusing to waive her immunity. *See, e.g., Gardner,* 392 U.S. at 278, 88 S.Ct. 1913, 20 L.Ed.2d 1082("If appellant, a policeman, had refused to answer questions specifically, directly, and narrowly relating to the performance of his official duties, without being required to waive his immunity with respect to the use of his answers or the fruits thereof in a criminal prosecution of himself, the privilege against self-incrimination would not have been a bar to his dismissal.") (internal citation omitted); *Uniformed Sanitation Men,* 392 U.S. at 285, 88 S.Ct. 1917, 20 L.Ed.2d 1089 ("[P]etitioners, being public employees, subject themselves to dismissal if they refuse to account for their performance of their public trust, after proper proceedings, which do not involve an attempt to coerce them to relinquish their constitutional right."). *See also Lefkowitz v. Cunningham,* 431 U.S. 801, 806, 97 S.Ct. 2132, 53 L.Ed.2d 1 (1977) ("Public employees may constitutionally be dis-

---

**22.** The trial court concluded that their statements were voluntary. *Id.* at 495 n. 2, 87 S.Ct. 616.

charged for refusing to answer potentially incriminating questions concerning their official duties if they have not been required to surrender their constitutional immunity.").

In a number of circuit cases within the last decade or so, these principles have been reaffirmed. In *Wiley v. Mayor & City Council of Baltimore*, 48 F.3d 773 (4th Cir.1995), police officers and a police association brought a civil rights suit against an assistant state's attorney alleging that officers' constitutional rights were violated when they were compelled to take a lie detector test upon threat of job loss. Because the officers had not been asked to waive their privilege against self-incrimination, and the questions posed to them were narrowly job-related, the court held that the officers' Fifth Amendment rights had not been violated. *Id.* at 777. In explaining its decision, the court drew on *Gardner* and *Uniformed Sanitation Men*, noting that the language in those cases "strongly indicates that forcing a public employee to answer potentially incriminating job-related questions does not implicate the Fifth Amendment unless the employee is also compelled to waive his privilege." *Id.*

The same result was reached by the Eighth Circuit in *Hill v. Johnson*, 160 F.3d 469 (8th Cir.1998), a case involving a sheriff's department officer who was terminated after he refused to answer questions about the disappearance of a photograph of a beaten detainee and failed to show up for a polygraph examination. The sheriff's department officer alleged that the sheriff had violated his Fifth Amendment rights when he discharged him for refusing to answer the questions and failing to take the polygraph examination. *Id.* at 471. The Eighth Circuit disagreed, concluding

that the officer's allegations failed to allege the violation of a clearly established Fifth Amendment right. *Id.* Drawing on *Garrity, Gardner*, and *Uniformed Sanitation Men*, the court explained that the Fifth Amendment is violated "only by the *combined* risks of *both* compelling the employee to answer incriminating questions *and* compelling the employee to waive immunity from the use of those answers." *Id.* (emphases added). Thus, a public employer may put a public employee to the choice of either testifying about the performance of official duties or forfeiting her job "[a]s long as a public employer does not demand that the public employee relinquish the employee's constitutional immunity from prosecution." *Id.* Accordingly, since the officer had not been asked to waive his privilege against self-incrimination, his dismissal did not violate the Fifth Amendment. *Id.*[23]

Finally, and most recently, the Sixth Circuit held in *Lingler v. Fechko*, 312 F.3d 237 (6th Cir.2002), that a police officer's Fifth Amendment rights were not violated when he was ordered to prepare a report detailing his involvement in the disappearance of some of the department's furniture. Citing *Wiley*, the court held that no Fifth Amendment violation had occurred because the officer had not been compelled to waive his privilege against self-incrimination and because his statements were never used against him in a subsequent criminal proceeding. *Id.* at 239–40.

### 3. Analysis

▮▮▮▮ In light of the teachings of *Garrity, Gardner*, and *Uniformed Sanitation Men* and such recent cases as *Lingler, Hill*, and *Wiley*, Plaintiffs' Fifth Amendment claim cannot stand. Plaintiffs

---

**23.** In rejecting the officer's claims, the court also rejected the officer's argument that the sheriff's mere failure to expressly offer immunity constituted an impermissible attempt to compel a waiver of immunity. *Id.*

were not compelled to answer Sgt. Kagy's questions or to waive their immunity.[24] Since, as the Eighth Circuit has explained, the Fifth Amendment is violated "only by the *combined* risks of *both* compelling the employee to answer incriminating questions *and* compelling the employee to waive immunity from the use of those answers," *Hill*, 160 F.3d at 471, no Fifth Amendment violation occurred here.

■■■ Nor does the mere fact that the Department may have altered Plaintiffs' shifts or job duties in response to their refusal to answer Sgt. Kagy's questions give rise to an actionable Fifth Amendment claim. As the *Garrity* line cases make clear, a public employer may take adverse employment actions against a public employee who refuses to answer questions narrowly tailored to the performance of her job duties. So long as the employer is not penalizing the employee's refusal to waive her immunity or attempting to compel the employee to waive her immunity, no violation of the Fifth Amendment has occurred. In this case, Plaintiffs were never asked to waive their immunity, and indeed never did waive their immunity. Accordingly, no Fifth Amendment violation occurred.

■■■ Moreover, Plaintiffs' Fifth Amendment claim fails for an additional reason: since Plaintiffs were never charged with a crime, let alone tried for

one, no use of their statements has ever been made. In *Chavez v. Martinez*, 538 U.S. 760, 123 S.Ct. 1994, 155 L.Ed.2d 984 (2003), the Supreme Court held that a violation of the Self–Incrimination Clause does not occur absent the use of the compelled testimony in a criminal case.[25] Therefore, since Plaintiffs have never been charged with a crime, let alone tried for one, their Fifth Amendment claim must fail under *Chavez*.[26]

### C. Fourteenth Amendment

Plaintiffs allege two violations of the due process clause of Fourteenth Amendment. First, Plaintiffs allege that Defendants violated their right to be free from coercive police interrogations. Second, Plaintiffs allege that Defendants violated their right to be free from governmental conduct that shocks the conscience.

■■■ Neither of these claims is properly analyzed under the due process clause of the Fourteenth Amendment. As the Supreme Court has repeatedly held, "Where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *Albright v. Oliver*, 510 U.S. 266, 273, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (quoting *Graham v. Connor*,

**24.** Moreover, Sgt. Kagy's questions were narrowly tailored to the performance of their job duties

**25.** In reaching this judgment, the Court rejected the view that the use of compulsive questioning, standing alone, violates the Fifth Amendment. *Id.* at 766–73, 123 S.Ct. 1994. In a opinion joined by the Chief Justice and Justices Scalia and O'Connor and which expressed the judgment of the Court, Justice Thomas reached this conclusion based on a close reading of the text of the Fifth Amendment and the Court's prior case law. *Id.* In a

concurring opinion joined by Justice Breyer, Justice Souter reached this conclusion by carefully balancing the costs and benefits of adopting the Ninth Circuit's rule. *Id.* at 777–79 (Souter, J., concurring). Whatever the rationale, however, the Court squarely rejected the view that compulsive questioning by itself can violate the Fifth Amendment.

**26.** Although the Ninth Circuit has limited the application of *Chavez* to § 1983 cases, *see United States v. Antelope*, 395 F.3d 1128, 1141 (9th Cir.2005), this is a § 1983 case and is thus governed by *Chavez*.

490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)) (internal quotation marks omitted). *See also United States v. Lanier,* 520 U.S. 259, 272 n. 7, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997) (explaining that where a "constitutional claim is covered by a specific constitutional provision . . . the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process."); *Fontana v. Haskin,* 262 F.3d 871, 881–82 (9th Cir.2001) (rejecting the plaintiffs' substantive due process claim because her claim was better analyzed under the Fourth Amendment).[27] Thus, since Plaintiffs' claims are covered by the Fourth and Fifth Amendments, they must be analyzed under the Fourth and Fifth Amendments, as the Court did above. Nevertheless, even if analyzed under the Fourteenth Amendment, Plaintiffs' claims fail.

### 1. Right to be Free from Coercive Police Interrogations

Plaintiffs assert that Defendants violated their right to be free from coercive police interrogations.[28] In making this claim, Plaintiffs rely on *Cooper v. Dupnik,* 963 F.2d 1220 (9th Cir.1992).

In *Cooper,* the Ninth Circuit held that the plaintiff stated a cause of action under § 1983 for a violation of his right to be free from coercive police interrogations where he alleged that the police had interrogated him for hours without properly administering the *Miranda* warning and without heeding his repeated requests to remain silent. *Id.* at 1244–48. The facts indicated that the police conducted the unlawful interrogation in a deliberate and premeditated attempt to extract statements which, even if not admissible as part of the prosecution's case-in-chief, would deter the plaintiff from testifying or invoking an insanity plea and would have served as fodder for impeachment if the plaintiff had elected to testify. *Id.*

■ As even this cursory summary of *Cooper* indicates, the facts of this case are dramatically different. Unlike the officers in *Cooper,* Sgt. Kagy did not interrogate Plaintiffs for hours. At most, he questioned them for a few minutes. Nor did Sgt. Kagy ignore repeated requests by the Plaintiffs to remain silent; on the contrary, he terminated the questioning as soon as Plaintiffs invoked their Fifth Amendment rights. Under the benchmark established by *Cooper,* Plaintiffs' allegations simply do not rise to the level of coercion necessary to state a claim for coercive police questioning. *Cf. Cunningham v. City of Wenatchee,* 345 F.3d 802, 810–11 (9th Cir.2003) (holding that an eight-hour interrogation did not rise to the level of a coercive interrogation where the plaintiff was given a break for food and water).

### 2. Right to be Free from Government Conduct That Shocks the Conscience

■ The Supreme Court has held that governmental conduct which shocks the conscience violates the due process clause of the Fourteenth Amendment. *Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952). The threshold question in such cases is "whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to

---

**27.** Of course, where a plaintiff's claim is not covered by a specific constitutional provision, it is properly analyzed as a substantive due process claim. *See, e.g., County of Sacramento v. Lewis,* 523 U.S. 833, 843, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998).

**28.** Under Ninth Circuit precedent, a coercive interrogation exists where "the totality of the circumstances shows that the officer's tactics undermined the suspect's ability to exercise his free will." *Cunningham v. City of Wenatchee,* 345 F.3d 802, 810 (9th Cir.2003).

shock the contemporary conscience." *County of Sacramento v. Lewis,* 523 U.S. 833, 847 n. 8, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998). The type of conduct which is most likely to rise to the "conscience-shocking level" is "conduct intended to injure in some way unjustifiable by any government interest." *Id.* at 849, 118 S.Ct. 1708. Nevertheless, conduct which was not intentional may rise to the conscience-shocking level in some circumstances. *Id.* at 849–50, 118 S.Ct. 1708 (citing *City of Revere v. Massachusetts Gen. Hosp.,* 463 U.S. 239, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983)).

■ In *Cooper,* the Ninth Circuit found that the plaintiff stated a viable claim under § 1983 that the defendants had violated his right to be free from governmental conduct that shocks the conscience. *Cooper,* 963 F.2d at 1248–50. But as detailed above, the facts here bear no comparison to those alleged in *Cooper.* Moreover, even apart from *Cooper,* the facts here do not shock the conscience. Simply put, Sgt. Kagy's conduct in questioning Plaintiffs for several minutes but immediately terminating the questioning upon their invocation of their Fifth Amendment rights is not so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience. Accordingly, Plaintiffs' shock-the-conscience claim fails.

### D. Clearly Established Nature of the Right

#### 1. Legal Principles

Because the Court has determined that Defendants did not violate Plaintiffs' Fifth Amendment or Fourteenth Amendment rights, the Court need not turn to the second step of the two-part analysis set forth by the Supreme Court in *Saucier:* whether the law regarding the constitutional right violated by Defendants was clearly established at the time of the constitutional violation. *Saucier,* 533 U.S. at 200, 121 S.Ct. 2151. *See also Serrano v. Francis,* 345 F.3d 1071, 1077 (9th Cir. 2003). Nevertheless, the Court will undertake the "clearly established" inquiry simply to illustrate that Defendants' conduct, even if violative of Plaintiffs' constitutional rights, did not violate clearly established rights.

■ As the Supreme Court has repeatedly emphasized, the "clearly established" inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151. Indeed, " 'the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.' " *Id.* at 202, 121 S.Ct. 2151 (quoting *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). In other words, "[t]he relevant, dispositive inquiry is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202, 121 S.Ct. 2151. If a reasonable officer "could have reasonably but erroneously believed that his or her conduct did not violate [Plaintiffs'] rights," then qualified immunity must be granted. *Devereaux v. Abbey,* 263 F.3d 1070, 1074 (9th Cir.2001) (en banc).

■ The officer's conduct is measured according to the state of the law as of the date of events giving rise to the lawsuit—that is, "officials are charged with knowledge of constitutional developments at the time of the alleged constitutional violation." *Lum v. Jensen,* 876 F.2d 1385, 1387 (9th Cir.1989), *cert. denied,* 493 U.S. 1057, 110 S.Ct. 867, 107 L.Ed.2d 951 (1990). In determining whether the law

was clearly established at such time, a court "need not look to a case with identical or even 'materially similar' facts." *Serrano*, 345 F.3d at 1077 (quoting *Hope v. Pelzer*, 536 U.S. 730, 739–41, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002)). "[S]tate officials are not entitled to qualified immunity simply because no case with materially similar facts has held their conduct unconstitutional. The standard is one of fair warning: where the contours of the right have been defined with sufficient specificity that a state official had fair warning that her conduct deprived a victim of his rights, she is not entitled to qualified immunity." *Haugen v. Brosseau*, 339 F.3d 857, 873 (9th Cir.2003) (citations omitted).

"A right can be clearly established even though there was no binding precedent in this circuit" at the time of the alleged violation. *Lum*, 876 F.2d at 1387. Where there is no binding precedent, courts in the Ninth Circuit "look to all available decisional law, including the law of other circuits and district courts, to determine whether the right was clearly established." *Id.Accord Osolinski v. Kane*, 92 F.3d 934, 936 (9th Cir.1996); *Figueroa v. United States*, 7 F.3d 1405, 1409 (9th Cir.1993); *Capoeman v. Reed*, 754 F.2d 1512 (9th Cir.1985). If there is no on-point Ninth Circuit authority and are few other cases on point, then a court may "evaluate the likelihood that this circuit or the Supreme Court would have reached the same result as courts that had already considered the issue." *Lum*, 876 F.2d at 1387. *Accord Osolinski*, 92 F.3d at 936; *Figueroa*, 7 F.3d at 1409.

Finally, it should be noted that several cases have indicated that a court's analysis in determining whether a constitutional violation has occurred is relevant to determining whether the right was clearly established—that is, if the court's analysis reveals that the question of whether a constitutional right has been violated is a close one, that is a factor that weighs in favor of a finding that the right in question was not clearly established. *Mena v. City of Simi Valley*, 332 F.3d 1255, 1266 (9th Cir.2003); *Cox v. Roskelley*, 359 F.3d 1105, 1112 (9th Cir.2004).

### 2. Analysis

#### a. Plaintiffs' Fourth Amendment Right to be Free from Unreasonable Seizures

##### i. Was it clearly established that Defendants' conduct constituted a seizure?

 Even if the Court had found that a seizure took place, it would not necessarily follow that it was clearly established at the time that Defendants' conduct in this context constituted a seizure. Indeed, as the Court noted above, the Seventh Circuit held in *Driebel* that Huston had not been seized even though he had been advised that he was under criminal investigation. *Driebel*, 298 F.3d at 635, 646–49. Moreover, to the extent that *Driebel* held that Huston had not been seized because (1) he had not been physically restrained, (2) he retained possession of his department-issued equipment, and (3) he was compensated for the time he spent at headquarters, *id.* at 647–48, a reasonable officer would have concluded, based on *Driebel*, that Defendants' conduct here did not constitute a seizure. Accordingly, it was not clearly established at the time that Plaintiffs were seized within the meaning of the Fourth Amendment.[29]

---

**29.** The Court notes that this Court's decision in *Myers* had not been decided at the time of the events of this case.

### ii. Did Defendants' conduct in seizing Plaintiffs violate a clearly established right?

Even if the Court had found that an unreasonable seizure had taken place, it would not necessarily follow that Defendants violated a clearly established right. Indeed, the facts of this case are so unusual, and the case law involving the existence of probable cause in analogous situations is so unsettled, that it simply was not clearly established at the time that Defendants' conduct violated a clearly established right.[30]

To be reasonable, an arrest must be supported by probable cause. *Allen,* 73 F.3d at 236. Probable cause exists "when the facts and circumstances within the officer's knowledge are sufficient to warrant a prudent person to believe 'that the suspect has committed, is committing, or is about to commit an offense.'" *Barry,* 902 F.2d at 773 (quoting *DeFillippo,* 443 U.S. at 37, 99 S.Ct. 2627). Of course, probable cause does not require certainty. "[A]s the very name implies, we deal with probabilities [in dealing with probable cause]." *Brinegar,* 338 U.S. at 175, 69 S.Ct. 1302, 93 L.Ed. 1879; *see also Maryland v. Pringle,* 540 U.S. 366, 371, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003) ("The probable cause standard is incapable of precise definition or quantification into percentages because it deals with probabilities . . . ."). Whether an ar-

rest was supported by probable cause is judged based on what was known at the time of the arrest; evidence obtained later or as a result of the arrest cannot be used to support the existence of probable cause *Allen,* 73 F.3d at 236.

At the time of Plaintiffs' alleged seizure, Defendants had the following facts in their possession: (1) Plaintiffs had participated in a narcotics investigation near the intersection of Union Pacific and Indiana Avenues in East Los Angeles at around 1:30 a.m., (2) a civilian telephoned the LAPD at about 1:40 a.m. to report that a single male deputy, possibly Hispanic, had crossed Union Pacific and struck him with a flashlight in the back and head, and (3) Sgt. Burke and Watch Commander Moreno had verified the civilian's physical injuries to his head and back and had obtained a videotaped statement from the civilian.

Taken together, these facts certainly made it more likely than not that one of the deputies was the assailant. Indeed, given the fact that there is no evidence that other deputies were in the vicinity at that time, simple logic dictates that one of the deputies *had* to have been the assailant.[31] Nevertheless, the civilian's description was vague, and the specificity of a victim's description is one of the factors which informs the probable cause determination. *Cf. Washington v. Lambert,* 98

---

**30.** The Court assumes, for the sake of argument, that Plaintiffs' detention, if it constituted a seizure, constituted an arrest. Nevertheless, the Court notes that there are "'no rigid time limit[s]'" on investigatory stops, *see Gallegos,* 308 F.3d at 992 (quoting *Sharpe,* 470 U.S. at 685, 105 S.Ct. 1568, 84 L.Ed.2d 605); *cf. United States v. Hbaiu,* 202 F.Supp.2d 1177, 1184–85 (D.Kan.2002) (finding that a one hour, forty-five minute detention was an investigatory stop), and that the conduct at issue here, though intrusive in terms of time, was not particularly intrusive in terms of space or the methods used. Although Plaintiffs were confined to a particular

location, they were free to use the restroom without an escort and were not prevented from using their cell phones. Moreover, they were not touched, searched, handcuffed, or placed in a holding cell. Finally, there is no evidence that Sgt. Kagy purposefully delayed his investigation, and indeed Plaintiffs were interviewed by him shortly after he got to the Station.

**31.** While one of the Plaintiffs is a woman, she is Hispanic, was in uniform, and did participate in the narcotics investigation at that location. Moreover, it was night time.

F.3d 1181, 1190–91 (9th Cir.1996) (stating the same proposition with respect to reasonable suspicion; by implication, it applies to probable cause).[32] The question thus becomes whether a reasonable officer would have known that the circumstantial evidence which Defendants had in their possession namely, that the deputies were the only deputies in the vicinity at that time—did not suffice to establish probable cause with respect to all of the deputies given the fact that the civilian's description was too vague to establish probable cause with respect to them.

While it is true that, as Plaintiffs note, that it was clearly established at the time that "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause," *Ybarra v. Illinois,* 444 U.S. 85, 91, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979), Plaintiffs were not suspects because they were in the proximity to others independently suspected of criminal activity; they were suspected because they were in the immediate vicinity and generally matched the description provided by the civilian. Thus, *Ybarra* is not directly on point.

Nor is Plaintiffs' attempt to analogize this case to *United States v. Brown,* 951 F.2d 999 (9th Cir.1991), convincing. In that case, the Ninth Circuit held that membership in a corrupt police unit does not, without more, establish probable cause to arrest an individual officer within that unit. *Id.* at 1003. In this case, however, Plaintiffs were not suspects because of their membership in a particular unit; they were suspects because they were in the immediate vicinity of the assault and because they each generally matched the civilian's description.

Instead, the Court finds the Ninth Circuit's decision in *Rutherford v. City of Berkeley,* 780 F.2d 1444 (9th Cir.1986), and the Supreme Court's decision in *Maryland v. Pringle,* 540 U.S. 366, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003), instructive.[33] In *Rutherford,* the plaintiff alleged that he had been assaulted and battered by several police officers. *Id.* at 1445. The officers did not deny arresting the plaintiff or being at the scene, but they did deny beating him. *Id.* At trial, the plaintiff was unable to identify which of the defendants actually kicked or punched him but did testify to seeing them around him at the time of the beating. *Id.* At the close of the plaintiff's case, the district court directed a verdict in favor of the defendants. *Id.* at 1445–46. On appeal, the Ninth Circuit reversed. *Id.* at 1448. Noting that the plaintiff had testified to seeing the officers at the time of the beating and that the "officers agreed that they were among the five or six officers who detained, arrested, and handcuffed [the plaintiff]," the court explained that "a jury could reasonably infer that the named officers were participants in punching or kicking [the plaintiff]." *Id.*

Here, as in *Rutherford,* the civilian could not identify which deputy struck him. Nevertheless, the civilian described his attacker as a deputy sheriff, and Plaintiffs and Deputy Joe Carrillo were the only deputies on the scene at the time.[34] To be

---

**32.** In a case decided after the facts at issue in this case, the Ninth Circuit squarely held that a general resemblance to a vague description cannot, as a matter of law, give rise to probable cause. *Grant v. City of Long Beach,* 315 F.3d 1081, 1088 (9th Cir.2002).

**33.** Plaintiffs attempt to distinguish *Rutherford* on the ground that it arose in the context of a directed verdict. However, while the standard for a directed verdict is not identical to the standard for probable cause, both turn on what a reasonable person could infer from the facts. Thus, the posture in which *Rutherford* arose does not preclude its application here.

**34.** Some of the Plaintiffs have submitted affidavits indicating that they were inside the residence being searched for part of the time. However, as it is not clear when the civilian

sure, there is a distinction between the facts of *Rutherford* and the instant case: there, the officers were in the plaintiff's immediate presence at the time of the alleged assault, and the plaintiff was able to identify which officers were surrounding him at the time. Here, by contrast, the civilian testifies to only one deputy being in his immediate presence, and is unable to identify which one. Nevertheless, the facts of the two cases do bear a resemblance.[35] In *Pringle*, an officer discovered drugs and a large quantity of cash in a car with three occupants.[36] *Id.* at 368, 124 S.Ct. 795. When the officer was unable to determine which of the three occupants owned the money and drugs, he arrested all three. *Id.* at 368–69, 124 S.Ct. 795. Subsequently, one of the passengers confessed to owning the drugs and money, and was convicted. *Id.* at 369, 124 S.Ct. 795. On appeal, the Supreme Court held that the officer had probable cause to arrest the passenger. *Id.* at 371–72, 124 S.Ct. 795. The Court explained:

> We think it an entirely reasonable inference from these facts that any or all three of the occupants had knowledge of, and exercised dominion and control over, the cocaine. Thus a reasonable officer could conclude that there was probable

cause to believe Pringle committed the crime of possession of cocaine, either solely or jointly.

*Id.* at 372, 124 S.Ct. 795. While the facts of *Pringle* can also be distinguished from the instant case, Defendants faced a similar situation here: one of a small group of individuals had to be the assailant. Not only did each of the Plaintiffs answer to the general description provided by the civilian—(1) all were deputy sheriffs, (2) all had been involved in an investigation near Indiana Street and Union Pacific Avenue at around 1:30 a.m., and (3) all were Hispanic—but there were no other deputies matching the civilian's description in the vicinity at that time. True, an automobile is a more confined setting than an intersection, but the logical principle remains the same.

In light of *Rutherford* and *Pringle*, it cannot be said that the issue of whether probable cause exists in a situation like the instant one was clearly established at the time. This is not, after all, a case in which the victim provides a bare-bones description that matches an innumerable number of people. *See, e.g., Grant,* 315 F.3d at 1088; *Commonwealth v. Jackson,* 459 Pa. 669, 331 A.2d 189 (1975). Nor is this a

---

was hit or when Plaintiffs were inside the residence, their declarations do not alter the analysis. Moreover, only those facts which the Department or Sgt. Kagy knew at the time are relevant to the probable cause inquiry. Plaintiffs have not shown that this information was known to the Department or Sgt. Kagy at the time.

**35.** While the Ninth Circuit held in *Jones v. Williams,* 297 F.3d 930, 936 (9th Cir.2002), that *Rutherford* does not permit "an inference of individual liability ... based on merely being present at the scene of [a] search," that case is distinguishable. In that case, there was *no* description of the officer who committed the alleged constitutional violation. The *only* evidence consisted of the fact that the officers were present at the scene. Here, by

contrast, there was a description, one which Plaintiffs generally matched.

**36.** Although *Pringle* was decided after the events at issue in this occurred, the fact that the Court granted certiorari in that case suggests that the existence of probable cause in a *Pringle*-like situation was unclear at the time. Indeed, as a leading treatise on Section 1983 indicates, "[t]he reach of the Court's decision in [*Pringle*] is uncertain." 1 Martin A. Schwartz, *Section 1983 Litigation: Claims and Defenses* § 3.19[B], at 3–636.3 (4th ed. 2005–2 Supplement). Finally, to the extent that the facts of the instant case are even more unique than those at issue in *Pringle*, it can hardly be said that Defendants' conduct violated clearly established law.

situation like *Brown* in which officers are suspected of wrongdoing solely because of their membership in a particular unit. Here, the civilian's description and the circumstantial evidence of the deputies' presence at the scene indicated that the entire universe of possible suspects consisted of Plaintiffs and Deputy Joe Carrillo. Given these unusual circumstances, the Court cannot say that a reasonable officer would have known that probable cause did not exist.

b. *Plaintiffs' Fifth Amendment Privilege Against Self–Incrimination*

Given the complexity of the application of the Fifth Amendment to the public employment context, and given the consistent line of authority holding that conduct such as Defendants' does not violate the Fifth Amendment, it cannot be said that Defendants' conduct in questioning Plaintiffs and in subsequently reassigning them violated a clearly established right. Indeed, Plaintiffs have not cited a single case in which a Fifth Amendment violation was found in similar circumstances. Accordingly, no reasonable officer could have known that Defendants conduct violated clearly established law.

c. *Plaintiffs' Fourteenth Amendment Due Process Rights*

Given the gross disparity between Defendants' conduct here and the conduct of the officers in *Cooper*, it can hardly be said that *Cooper* would have put a reasonable officer on notice that Defendants' conduct here clearly violated Plaintiffs' Fourteenth Amendment rights. Accordingly, even if Defendants had violated. Plaintiffs' due process rights, they would be entitled to qualified immunity.

E. *Conspiracy Claim*

■ In order to prove a conspiracy under § 1983, the plaintiff must show an agreement or meeting of the minds between the alleged conspirators. *Franklin v. Fox*, 312 F.3d 423, 441 (9th Cir.2002); *Woodrum v. Woodward County, Oklahoma*, 866 F.2d 1121, 1126 (9th Cir.1989); *United Steelworkers v. Phelps Dodge Corp.*, 865 F.2d 1539, 1540–41 (9th Cir. 1989) (en banc). To prevail, the plaintiff need not show that each participant knew the exact details of the conspiracy, but she must establish that each participant shared a common objective. *Franklin*, 312 F.3d at 441; *United Steelworkers*, 865 F.2d at 1541. Plaintiffs have failed to make any showing that Defendants shared a common objective.

■ In any event, a conspiracy claim under § 1983 is not actionable unless there has been an actual deprivation of the plaintiff's constitutional rights. *Woodrum*, 866 F.2d at 1126. Since Defendants did not deprive Plaintiffs of any of their constitutional rights, Plaintiffs' conspiracy allegation fails as a matter of law.

F. *Monell Claim*

■ A municipality may be held liable under § 1983 for an officer's unconstitutional conduct where the officer's conduct was pursuant to a municipal custom or policy, even one not formally approved by the municipality's decisionmaking body. *Monell v. Dep't of Social Servs. of N.Y.*, 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A municipality may not be held liable under § 1983, however, where the officer's conduct did not actually violate the plaintiff's constitutional rights, even if the municipality has a custom or policy which authorizes or causes constitutional violations. *City of Los Angeles v. Heller*, 475 U.S. 796, 799, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986) (per curiam); *Quintanilla v. City of Downey*, 84 F.3d 353, 355 (9th Cir.1996).

Because Defendants did not violate Plaintiffs' constitutional rights, Plaintiffs' *Monell* claim fails as a matter of law.

## V. CONCLUSION

Because Plaintiffs were not seized within the meaning of the Fourth Amendment, Defendants did not violate Plaintiffs' Fourth Amendment rights. Because Defendants did not compel Plaintiffs to waive their rights under the Fifth Amendment or attempt to use Plaintiffs' statements against them in a subsequent criminal case, Defendants did not violate Plaintiffs' Fifth Amendment rights. Finally, because Defendants' conduct did not shock the conscience or constitute coercive police conduct analogous to that at issue in *Cooper*, Defendants did not violate Plaintiffs' due process rights under the Fourteenth Amendment. Finally, because the law governing Defendants' conduct was not clearly established at the time, Defendants are entitled to qualified immunity even if their conduct did violate Plaintiffs' rights. Accordingly, Defendants' Motion for Summary Judgment [60] is hereby GRANTED.

IT IS SO ORDERED.